BURGE *et al. vs.* HAMILTON *et al.*, executors.

[This case was argued at the last term, and the decision reserved.]

1. A will was executed on July 18, 1881; as offered for probate, it was written on ten pages; pages 1, 2, 3, 4, 5, 7 and 9 were clearly numbered, and without alteration in the numbering; on page 6, the number appeared to have been changed from 5 to 6; on page 8, the number appeared to have been altered from 7 to 8; on the last page, the number at the top of the page had been altered from 11 to 10; at the bottom of this page was the number 11; the entire will was in the handwriting of the testator, and his signature was on each of the pages; each page contained a separate paragraph of the will. On the last page was written the following:

"I nominate and appoint David B. Hamilton, Judge George Hillyer and Eben Hillyer to be executors of this my will, to carry the same into effect according to law, and which will I have written on the above and foregoing pages, numbered from 1 to 11 inclusive, and identified by name on the margins, and hereunto subscribed my hand and affixed my seal for its due execution, this the 18th day of July, 1881."

On the page preceding this, and numbered 9, was the residuary clause, leaving all the residue of the estate to a residuary legatee. In July, 1882, a codicil was executed, in which it was stated that it was a codicil to the will of July 18, 1881, and that said will was ratified, approved and declared to be the testator's "last will in

all respects, except in so far as the same is changed by this codicil;" it also referred to the witnesses to the original. This codicil[1] was written by the attorney and confidential adviser of the testator, and its pages were numbered 12, 13 and 14. It referred to the subject-matter of certain of the items contained in the original will. This codicil was attached to the paper offered as the original will; and the two were offered for probate together, as forming the last will and testament of the testator:

*Held,* that the two papers together present an ambiguity as to the number of pages and the identity of the paper as propounded with the will as executed; and it was admissible to show by the attorney, who drew the codicil and was a witness to it, that the will, as then exhibited to him by the testator, was the same as that offered for probate; that it had only the same ten pages; that he read it over to the testator carefully page by page, to see what alterations were desired to be made by the codicil; that he took it home with him, at testator's request, to see that it should be all right, and that the codicil might be prepared so as to fit in with it; and that he mentioned to the testator the mistake in paging, who simply observed that it was a mistake.

(*a.*) Such facts could be shown by the attorney who drew and witnessed the codicil, and being supported by adminicular proof of identity, it would warrant the jury in finding in favor of the will.

2. The following principles may be deduced from the decisions of the English courts, and the Code and decisions of this court do not conflict with them, but in many respects enlarge the scope thereof.

(*a.*) Parol evidence is admissible to explain ambiguities.

(*b.*) Also to show what papers constitute a will offered for probate, with the attesting clause and witnesses signing according to law.

(*c.*) Also to show the identity of the will with the paper propounded, by statements of the testator at the time of the execution, before the execution and after it.

(*d.*) Greater latitude is given to the admission of parol evidence on issues of probate than on the construction of the will after probate.

(*e.*) A codicil expressly affirming a will which could not convey realty or was illegally executed, if that codicil be legally executed, made the will valid, especially if annexed thereto.

(*f.*) A will identified in part will not be refused probate as to that part because of the uncertainty of other probable parts, the contents of which lost or missing parts are unknown.

3. Although a will as originally executed may have been altered by the testator after that execution, yet if republished by a codicil, by being referred to therein and annexed thereto, it is made valid thereby; and it may be proved by extrinsic evidence that the alteration was made before the codicil.

(*a.*) *Revocavit vel non* is a similar question to *devisavit vel non*, and is a

question of fact for the jury; and declarations made prior to or at the time of the execution of the will or its revocation are clearly admissible.

4. Taking into consideration the circumstances of the case, it is morally certain that the will and codicil offered for probate contain the disposition and the entire disposition which the testator desired to make, and did make, of his property.

(*a.*) The parts of a will identified would not fail of probate on account of a missing part whose contents were unknown; and it not appearing in this case, if any part be missing, how far it would interfere with that which is present or in what way, a court will not destroy legacies before it.

5. The judge has the discretion, in trying issues in civil cases, to have the jury stricken from the grand jury list.

6. There was no error in the charge or refusal to charge on the subject of the will being unnatural. A husband and wife being one, her kindred become his, and legacies to them were not unnatural.

(*a.*) In this case, it was more natural that the testator should give his property to his wife's kindred who grew up around him and associated with him—especially those whom he raised from infancy—than to those of his own kindred whom he rarely saw and scarcely knew.

7. There was not enough evidence on the issue of undue influence to raise a question about its exercise by anybody over such a man as the testator was, in the legal sense of undue influence; and there was no error which hurt the plaintiffs in error in refusing to charge as requested thereon.

8. There was no error in ruling and charging to the effect that parol evidence could not change, add to or contradict a written will, but where there were ambiguities, whether latent or patent, they could be explained by it; nor in refusing requests to charge to the contrary.

(*a.*) There were ambiguities needing explanation, and it was proper to refuse to charge on the theory that there were none.

9. There was no error in the admission of parol evidence to identify the paper propounded as the will of the decedent.

(*a.*) There was no error in the charges or refusals to charge which requires a new trial. The general charge was fair, and the issues were fully and fair submitted.

10. Motions for continuance are in the discretion of the presiding judge, and unless that discretion has been abused and the ends of justice demand it, this court will not interfere with the ruling of the court below.

(*a.*) It will not necessitate a new trial that the court refused a continuance, on the ground that a witness had not been examined by interrogatories and was under promise to be present and her pres-

ence was desirable, where it appears that such witness was desired to testify on the question of undue influence, and that if her testimony were had, it would not, and ought not, to change the verdict.

(b.) Nor will it require a new trial because the court refused a continuance on the ground that certain clients of the moving attorney had just been made parties, it appearing that they lived in other states and were infants, and could have been of little use on the issue of undue influence, and the great issues in the case being on legal questions—on the admissibility of the testimony of the attorney who drew the codicil to the will, on the admissibility of the testator's statements, on the words and figures of the will and codicil, whether plain or ambiguous; especially as it does not appear that any one of the absent clients was a lawyer or capable of aiding counsel in this case.

HALL, J., concurred.

BLANDFORD, J., dissented from 10th head-note and subdivisions.

June 10, 1884.

Evidence.  Wills.  Husband and Wife.  Ambiguity. Continuance.  Parties.  Before Judge STEWART.  Floyd Superior Court.  March Term, 1883.

On August 7, 1882, D. B. Hamilton, George Hillyer and Eben Hillyer, as executors, propounded for probate a paper as the last will of Alfred Shorter, deceased, with a codicil thereto.  They set out the names of a number of persons as being next of kin of the testator.  Citation issued, and was served and published.  A *caveat* was filed, on the grounds of undue influence, fraudulent practices to influence the testator; that he labored under a mistake of fact as to the conduct of his heirs at law; that he was between eighty and ninety years of age, and yielded himself to the wishes of D. B. Hamilton and his family, and refused them nothing, and that frauds were practiced by them in various ways; that letters written were never received; and that relatives were so treated as to be compelled to leave, etc.

The ordinary rendered judgment in favor of the will, and ordered it to be recorded, and caveators entered an

appeal. On November 20, 1882, at the instance of the propounders, the judge of the superior court passed an order to have citation and service perfected on certain persons, as heirs at law and next of kin of the testator, who had not previously been named, and making them parties. One of the parties so named was a resident of Georgia; the others were living in Florida, Washington, D. C., and Arkansas, and were to be served by publication.

When the case was called, on March 28, 1883, a motion was made for continuance. (For the grounds, see the first ground of the motion for new trial.) This was overruled. The order overruling it recited that it appeared "that all parties interested have been made parties to the record in this case, and service having been duly perfected on them (as) heretofore required."

An order was taken, reciting that two of the caveators were minors, and T. P. Burge, one of the original caveators, was appointed guardian *ad litem* for them, and accepted the appointment. All of the caveators then filed an amendment to their *caveat;* and at their instance the court passed an order allowing this amendment and again making all the parties named parties to the case. (The chronological order of the orders making parties and the motion for continuance was a subject of difference in argument, but they appear in the record in the order stated.) Another amendment was also filed and allowed. The *caveat*, as amended, was to the whole will, on the ground that it was not the will of the testator and was not the same document referred to by him in the codicil; it was also to specific legacies, on substantially the grounds already stated, and because of an alleged alteration in one of the items.

It is unnecessary to recite the voluminous evidence in this case, further than to state that certain loose sheets, which appeared to have been a part of a will of testator, were introduced in evidence by the caveators. These were numbered 6, 7, 8 and 9. The first three were marked

" cancelled and subsequent will executed," and signed by the testator, and the fourth sheet had marks drawn across it, and his signature thereon was erased.

The evidence of T. W. Alexander, Esq. (on which one ground of the motion for new trial was based), on the subject of the will and codicil, was substantially as follows:

I drafted the codicil 8th July, 1882. I received a message from Col. Shorter through Mr. Hamilton that he desired to see me about some business. The request was that I should go at my earliest convenience. I went immediately. I met Mrs. Hamilton at the door; told her I had come, at Col. Shorter's request, to see him. She invited me into the parlor. She then carried me into his room. I went in, and he said: "Martha, open my bureau or trunk." Told her to get a tin box, which she did. He then told her to unlock it. She did so, and then left the room. Col. Shorter told me he had previously made a will; had sealed it in an envelope and put it in the box; that lately he had concluded to make two or three changes in it, and wanted me to prepare a codicil to the will. He picked up the will from the box, and said: " When I made the will I sealed it up and marked it as you see it is marked, and had no idea that I would change it." He gave me the envelope, and asked me to break it and make the changes. He said that no one in the world knew what his will contained, and he requested that I would not disclose its contents to any one, as he did not want any one to know its contents until after his death. This envelope was directed to the ordinary of Floyd county, Ga.; it is the identical one he took from the tin box, and which contained his will. I broke it at his request and read the will over to him. He was lying on the bed. As I would read he would occasionally make remarks about certain legacies in the will; discussed several of them; some at considerable length. When I finished reading the will, he told me what changes he wanted. At a table by his bed side I made a memorandum of the changes. [Producing paper.] This is the paper and memorandum I made at the time. I intended and expected to prepare a draft of the codicil right there, but he remarked to me: "I wanted you to examine that will to see if it was properly drawn and executed to stand the test." I examined it and told him that I could see no defect about it. He then remarked that he preferred that I take the will home with me, reread it, and prepare the codicil there. After that I remained and talked with him perhaps an hour longer; I think that I spent at least two hours with him. After I got through with the business and concluded my visit, I left, bringing the will with me to town to my office. During the time I was there, we conversed on various topics. He was weak and lying on top of the bed. He was lying down during a

portion of the time I was there; perhaps half the time. During the time, he got up and lit his pipe; he was an inveterate smoker.. He said to me, "I can't offer you a pipe." But he walked to the wardrobe and got a box of cigars, and I took one. We talked about various things, but mainly about this will and the disposition of his property. I will give details as well as I remember. He mentioned that he had given the college a certain amount of money. That, of course, could not be used as it was. He said, "I know they need funds for apparatus and about fixing the halls," and said, "I want to give the college five thousand dollars in addition; and I want that arranged so that it can be used immediately, under the direction of the presi-dent." He said, "I want to give the college five thousand dollars so that it can be used immediately." That he wanted to turn over the five thousand dollars before his death, if he had the funds on hand to do it with. He told me also that he had a relation by the name of Mrs. Ansley, who was in poor health, or her husband was, and that he wanted to assist her; that he wanted to give her five thousand dollars. He also said that she had a daughter at Shorter College; that he had heard the teachers speak of her in a very complimenta-ry way, and that he wanted her to have a thousand dollars to com-plete her education. In reference to Milton Cooley, he said: "I gave Cooley a legacy, but since that time he has died. He asked me what was best in the matter; said that he didn't want to give it to Mrs. Cooley, so that the children and she could squander it; wanted to put it in the hands of a trustee, so that the family would get the bene-fit of it. I suggested to him that he could appoint a trustee. He suggested Dr. Hillyer. I told him that I thought it would do very well. He told me that he had been settling with the Cooley and Harper children, and within the last two or three years had paid over to them about thirty thousand dollars—three thousand each—except Milton Cooley, who was entitled to three thousand dollars. He said: "I have not paid him, but have a bond with an accumulation of three hundred dollars interest, which has never been paid him nor his family." I said to him: "I see in your will you have not arranged about the selling of the three thousand dollars in bonds. Your executors may feel embarrassed by this omission. It is best for you to provide for that." And it was so done in the codicil. I believe those are the three provisons he made in the codicil that I now remember.

Q. "In whose handwriting is the original will, in the body of the will?"

A. "I had a conversation with him on that subject. I saw that the whole of it was in his own handwriting—all except the signatures of the witnesses. This was the part of it not in his own handwriting. I said to him: 'I see that this will is in your own handwriting.' He said, 'Yes,' that George Hillyer had drawn a will for him before,

and that he had drawn it from that. I took it that he had drawn it in the form of the will that George Hillyer drew for him. In reading over the residuary clause, he spoke of Mrs. Hamilton. After reading that residuary clause, Mr. Shorter, of his own volition, introduced the subject of his kind feeling for Mrs. Hamilton, and remarked to me that he and his wife raised her, I believe was his expression; that she had lived with them all of her life, and made this assertion : 'I have as great love or affection for her as you possibly can have for one of your daughters.' That was about the substance, and almost the language he used. . . . . From his conduct and conversation on that occasion and the manner of his delivery ; the way he demeaned himself in that respect, I discovered not the least diminution in his mind between that and any other period of his life, so far as the business in hand was concerned, and that is all we have to do with. I remember having this impression on my mind when I went there, finding him on his bed : I thought that I would see whether there was any failure in his mind, and I talked with him for that purpose, and I decided in my own mind that he was as competent as anybody could be, except so far as his physical condition was concerned. His mind was clear. I brought the will to my office, and the memorandum I had, according to his request, and prepared the codicil. Before I left his house the question came up, and I said to him, 'Mr. Shorter, it will be necessary to have three witnesses to the codicil, as to the will, and as you seem anxious to have this attended to, I will prepare it and be back on Monday morning at nine o'clock.' . . . . I met Dr. Holmes at the door, and told him what had occurred in reference to the execution of the codicil, and told him to come out Monday morning; that Mr. Selkirk would be there, so that we could witness it without any inconvenience. On Monday morning I saw Dr. Holmes, and he proposed to take me out to Colonel Shorter's in his buggy. We went out there at nine o'clock. The remark was made by Mr. Shorter that we were very nearly on time. Mr. Selkirk was there. I asked him and Dr. Holmes to walk in Mrs. Hamilton's room till I could see Mr. Shorter. I went into Colonel Shorter's room and read the codicil to him. I went in, closed the door, and read the codicil to him, and it was all to his satisfaction and purpose. I then went into the room where Mr. Selkirk and Dr. Holmes were, and brought them into Mr. Shorter's room. Mr. Shorter was lying on the bed then. There was a little table near the bed, and the paper and a pen lying on it. Mr. Shorter got up. I handed him a blank book, and he wrote his name at the proper place for the execution of the codicil, and on the margin of each of the pages, Dr. Holmes, Mr. Selkirk and myself witnessing the operation. I forget if Dr. Holmes signed first, but we three signed it in three feet of his bed. This is the paper in my handwriting. I was going to explain that, when the signatures had all been attached, I attached

the codicil to the will. I had taken some fasteners out there for the purpose of attaching it to the will when it was signed. I attached it upon the table."

Q. "You mean you attached this codicil to the will?"

A. "Yes, sir I understand that it has been detached sometime since the probate. It was attached then. I folded it up, put it in an envelope at Mr. Shorter's request, and that is the envelope that put it in. [Identifying envelope.] It was sealed up in his presence and in the presence of the others. This is the direction, "Last will of Alfred Shorter." Addressed to "Henry J. Johnson, Ordinary of Floyd County." He told me that he wanted it addressed as the other paper was, and it was addressed that way. I left it lying on the table. I don't remember about that. It was either left on the table or handed to him. We three remained in the room in conversation for a considerable length of time. I was there that morning more than an hour—perhaps an hour and a half. It was left there with Colonel Shorter. The next time I saw it, it was in the office of Mr. D. B. Hamilton. On the morning after Mr. Shorter was buried, I went to that place and met Mr. Johnson, the ordinary, Dr. Hillyer, Judge Hillyer and Mr. Hamilton. Mr. Johnson handed the package containing the will to me. I found it sealed up as it was at Mr. Shorter's house. I was requested to open it, and I did so."

Q. "Who asked you?"

A. "Mr. Johnson. He asked me to open it and see if it was the identical paper. I opened it, read it and recognized it to be the indentical will. I read it out and recognized that it was the same will that I had read at Mr. Shorter's. At the time of executing the codicil, testator was as rational upon all subjects as he ever was. I will mention another thing which I had forgotten to state. Upon this occasion, seeing that there was reference in the will and codicil to a little book, or to a book to which Mr. Shorter referred, I remarked to him that it might be important at some time or other to identify that book, and I would like to see it and examine it. I think that was on the morning of the execution of the codicil, before these other gentlemen had come in, however. He then got the book out of the same little box from which the will had been taken (I recognize that book you had as the one), and handed it to me. . . ."

Q. "I believe you said the body of the will was in Colonel Shorter's handwriting?"

A. "Yes, I recognize it as such. I have had a great deal of acquaintance. I have seen him write a great deal. I didn't examine it critically at the time. I have since. There is not a word of it that purports to be in his handwriting that is not in his handwriting, in my opinion. The word 'Forty,' in the Beeland bequest, alleged in the *caveat* to have been orignally 'Seventy-five,' never attracted my attention nor impressed itself on my mind at all, except that I knew

that the bequest to those heirs was forty thousand dollars. Another thing: I asked Mr. Shorter at the time—I said: 'Who is Mrs. Beeland?' I didn't know he had a kinsman by that name, and he mentioned the fact that Mrs. Beeland was his sister. I recollect that the word 'forty' was in the will then as now. I read it forty, and I have got another evidence that there can be no mistake about it."

Q. "State whether that word 'forty' is written by Colonel Shorter or by some other man?"

A. "Yes, sir; that is his handwriting, the same as the body of the will.        .        .        .        .        .        .        .        ."

Q. "In the latter part of the will, the language is: 'The above and foregoing pages numbered from one to eleven' or 'ten,' or whatever it may be, 'and identified by my name on the margin.' I notice that you numbered the codicil from twelve on."

A. "Yes, sir."

Q. "I will ask you if that will just read is the same will read to Col. Shorter—that Col. Shorter produced to you on the occasion testified about, and which was read over in his presence?"

A. "Yes; I remember that, after going back there with the codicil, I said, 'I see that you have numbered your will from one to eleven.' I told him that I had counted the pages and only found ten. He said, 'I made a mistake in the numbers.' I counted the pages and the number was ten. The figure is eleven. That is the identical paper."

Q. "Is there any page out of the will now which was there when it was read by you to Col. Shorter?"

A. "No. It is the same in whole. If it was taken out from the time I got it from him, I must have taken it out. I did not take it out. I called his attention to the fact that he had recited that there were eleven pages, and there were only ten pages in the will. He said that it was a mistake of his own. . . .

I drew the codicil to Col. Shorter's will; Mr. Hamilton never spoke to me in his life in reference to Col. Shorter's will, until he asked me to go out there. I had no conversation with him at any time on the subject of the account book. I called Col. Shorter's attention, when I read over the codicil to him, to the fact that there was a book referred to, that I might be able to identify it, and he reached over and got it out of the box on the bed. Never had any conversation with anybody upon the subject of Col. Shorter's will before the morning Mr. Hamilton requested me to go out, except that, long before the 18th of July, 1881, Maj. Ayer told me he witnessed a will made in 1878. I am confident that the will now read, and the writing and the provisions contained therein, are the same now as when I read the will over to Col. Shorter. I got it from Mr. Johnson as I gave it to Col. Shorter. I called Col. Shorter's attention to the fact that in his attestation clause it read from 1 to 11; that I had counted the leaves and there were only ten pages. He said perhaps he was mistaken in that. I

read it as eleven. There were no changes made in the will by any-body while it was in my possession. Col. Shorter made no changes while it was in my possession. Mr. Shorter didn't have the will in his hands after I went back there. I attached the codicil to it, and put it in an envelope, directed it to the ordinary, sealed it up, and handed it to Col. Shorter. Col. Shorter said he had sealed up the package (in which he had his will), and never expected a change would have to be made, and never expected it to be opened until after his death, but it had become necessary for him to make a codicil."

In explanation of some of the other grounds of the motion, it may also be stated that Mrs. Hamilton, who was the residuary legatee, and her brother, C. M. Harper, had been taken by the testator when children, and raised as his own, they were the nephew and niece of testator's wife, and lived with him a large portion of their lives, and Mrs. Hamilton was with him in his last sickness. Hamilton, who married one of these legatees, was a lawyer, and attended to business for Col. Shorter. The bulk of testator's property was given to relatives of his wife; and it appeared that he had been more intimately associated with them than with his own relatives.

The evidence showed that the testator, Alfred Shorter, had a mind of uncommon strength, and a will of unusual power; that he was able at all times, even to the immediate approach of death, to give direction and control to his purposes; and that his mind was clear and unobscured. The other evidence is sufficiently stated in the decision.

On the trial, the jury found for the propounders. Caveators moved for a new trial, on the following grounds:

(1.) Because the court erred in refusing and overruling the motion made by counsel for the caveators for a continuance of the case, which motion was submitted in writing, and verified by the oath of A. R. Wright, one of the attorneys for caveators, in the following words, to-wit.:

"OPEN COURT, FLOYD COUNTY, GEORGIA, March 27, 1883.
"In the matter of the probate and *caveat* of the will of the late Alfred Shorter, deceased, Augustus R. Wright, one of the counsel employed, upon consultation with associate counsel, states that they are

not so ready for trial and well prepared as justice to their clients requires, and for cause of continuance, shows that Mrs. Richardson, of Cherokee, Alabama, is a material witness for caveators, and from a letter received, is sick at Gadsden, Alabama; that her testimony was discovered last week, too late for interrogatories, and that Mrs. Richardson [cannot] come to the trial in person; that upon hearing that she would probably be a good witness for caveators, having been the wife of Capt. Alfred Shorter Truitt, now deceased, a favorite nephew of the late Col. Alfred Shorter, he, the said Wright, took the boat and went to see her at her residence in Alabama (other counsel being busy in other directions.) She told the said Wright, while the wife of Capt. Truitt at Col. Shorter's house, her treatment was such by Mrs. Shorter and her kin, especially Mr. Hamilton and his family (and excepting Dr. Hillyer and his wife, whose conduct was always cordial), that she refused to accompany her husband on his visits; that it was evident to anybody that they were jealous of any of Col. Shorter's kin, to whom he seemed to take any particular liking. Capt. Truitt was so treated before the war; he went to California, and it was only after long entreaty by letters and promises, he consented to come back. Witness stated much of letters and correspondence between herself and Mrs. Shorter, after her marriage with Capt. Truitt, in which she stated Mrs. Shorter accused her of wanting Col. Shorter's property, to which witness most indignantly replied. This witness is not absent by our consent or procurement, but, on the contrary, we were certain of having her present, until informed she was sick at her brother-in-law's, Col. Kyle's, in Gadsden, Alabama.

"Further, interrogatories were taken out for Mrs. Mallary, of North Carolina, and have not been answered, witness declining to answer them; that she is related by blood, as he is informed, to some of the propounders of the will. He has been informed, and believes, that Mrs. Mallary had said Mrs. Hamilton was not the favorite of Col. Shorter at all, among the nieces of Mrs. Shorter, but that Mrs. Brooks was his favorite and loved one, and that he regarded her as the most excellent of all his wife's kin, and one of the most excellent of earth, and spoke in praise of her as wife, mother and Christian. It was to know whether she had so said, and what she knew on that and other subjects, that interrogatories were sued out.

"And for further showing, he says he has not time enough in which to prepare his case as he thinks the justice of it requires; our clients with whom we have had intercourse are scattered in various parts of the United States, many of them we have had no chance to see, some in Arkansas, some in Texas, some in Mississippi, some in Florida, some in Washington, D. C. We have been continually getting facts by correspondence and otherwise. Counsel have been active and industrious; other cases on the docket have had precedence of

it, and it was only on Saturday last counsel were notified that a judge would be here to try this particular case, when some of the counsel desired other cases, and which were in order and had precedence according to law, to be tried in pursuance of the same. Counsel now desire time to go to Shelby, North Carolina, and to talk with Mrs. Mallary, who declines to answer interrogatories exhibited to her; it may be of the utmost importance in this case.''

[On cross-examination, counsel who made the showing stated the following, among other things :

Q. "Judge Wright, didn't we notify you in writing, three or four weeks ago, putting you upon notice that we would be ready for trial at this term?"

A. "It seems that you wrote to me to that effect, but it didn't have any effect, because I was doing my best. I was spending a good deal of time, and Col. Shorter was spending a good deal of time and money to get ready."

Q. ". tate your first knowledge of this?"

A. "Col. Shorter and myself were talking about her (Mrs. Richardson), and we thought probably she knew something about it. As the time approached I told Col. Shorter that it might be possible that she had better be seen, and told him that we had better see her. I think he said, You go and see her and I will probably go to LaGrange. I went there last week; didn't know what Mrs. Richardson would swear till I saw her; I then knew that I had struck an important witness."

Q. "Didn't I propose to you, that if you would make out any set of interrogatories, that I would cross them for you without delay?"

A. "I think you did."

Q. "Couldn't you have made out interrogatories for Mrs. Richardson and taken them down with you when you went?"

A. "I didn't know whether she was of value—I was seeking testimony."

Q. "You took out interrogatories for Mr. Mallary?"

A. "Yes."

Q. "How did you find out that he knew anything?"

A. "It would be a pretty difficult matter to tell you. I never corresponded with him or Mrs. Mallary."

Q. "How came you to take out interrogatories for her?"

A. "In consequence of something that occurred between her and Col. Shorter, when she was here."

Q. "She has been gone some months?"

A. "I don't think so."

Q. "No attorney on your side corresponded with her?"

A. "I think not."

Q. "Judge Wright, when did you first know that Mrs. Richardson was probably an important witness?"

A. "Col. Shorter corresponded with her on another subject two or three months ago. We talked about it, and seemed to think it not important. We afterwards concluded that it might be important to go there; this conclusion was just before I went down."

Q. "There was nothing contained in the correspondence of Col. Shorter and the lady to draw your mind to it; you knew as much as you knew at the time of going down?"

A. "I think there was a floating rumor that she might be an important witness. I think I got it from Mr. Harper. I came to the conclusion that a diligent lawyer should know by seeing her."

Q. "I am trying to see whether you used due diligence?"

A. "I think I did."

The propounders made a counter-showing, and introduced C. M. Harper and D. B. Hamilton to show that Truitt went west; that Hamilton did not live at the house of Col. Alfred Shorter when Truitt was there; and that the relationship between him and Truitt and between Harper and Truitt was most pleasant; that Col. Shorter died July 18, 1882; and that the proceeding to probate in solemn form was presented, a *caveat* filed, a motion to continue made before the ordinary to procure testimony and to prepare the *caveat*. Also that the commission attached to the interrogatories for Mrs. Mallary was issued March 12, 1883.]

(2.) Because the court erred in requiring the jury to try said case to be stricken from the grand jury, over the objection of counsel for caveators, both traverse juries being present in their boxes, and not otherwise engaged.

(3.) Because the document propounded as the last will and testament of Alfred Shorter, deceased, shows upon its face that it is not the whole will, and not entitled to probate, it being expressed in the instrument so offered as the original will, bearing date July 18, 1881, that it is written on pages numbered from 1 to 11 inclusive, when in fact that original will, as here presented for probate, is not written on pages numbered from 1 to 11 inclusive, but on 10 pages only, and the language of the codicil made

by said Alfred Shorter, dated July 10, 1882, and here presented for probate with the original will, so far as it relates to the ratification and republication of said original will, being as follows: " Being still of sound and disposing mind and memory, I, Alfred Shorter, do make the following codicil to the will made by myself on the 18th day of July, 1881, and attested by W. F. Ayer, J. C. McDonald, and J. B. Hine. Said will is now ratified, approved, and declared to be my last will in all respects, except in so far as the same is changed by this codicil." " The preceding three pages numbered 12, 13, 14, contain a codicil to the last will and testament of Alfred Shorter, executed on the 18th day of July, 1881, and are identified by his own sig· nature on the margin." Therefore, the codicil ratifies and republishes the original will as made and executed on the 18th day of July, 1881, except so far as the same is changed by the codicil, and not the document, as now presented for probate.

(4.) Because the court erred in admitting the evidence of T. W. Alexander, over objection of counsel for the caveators, stating the conversation between himself and Alfred Shorter, and what was said and done by each of them on the 8th day of July, 1882, and on the 10th day of July, 1882, as stated in said Alexander's testimony, the court holding that said testimony was admissible to show the condition of testator's mind, his motives and purposes in making his will, and to identify the document, or that it was recognized by the testator as his will, the objection being that such testimony could not be heard to alter, vary, add to, take from, or contradict the written instrument or will. And caveators excepted to that portion of said Alexander's testimony as to what said Shorter said to him about his affection for Martha Hamilton, more especially.

(5.) Because the verdict is contrary to evidence, and without evidence to support it.

(6.) Because the verdict is decidedly and strongly against the weight of evidence.

(7.) Because the verdict is contrary to law and evidence, and without any sufficient evidence to support it.

(8.) Because the jury found contrary to the law and the following charges of the court, to-wit: "If Alfred Shorter states in his will that the same is numbered from 1 to 11 inclusive, then parol evidence would be inadmissible to change or alter the number of pages as written." "Any statements made by testator, if any were made, to Col. Alexander, at the time of making the will, would be parol evidence." "Whatever might be the effect of the republication of a will by a codicil, generally speaking, or where the language used by the testator might be not inconsistent with an intention to adopt any alterations made since its first publication, whatever may be the effect in such case, generally speaking, as to adopting any changes made in the will after its original execution, no such intention to adopt such alterations can be inferred or even made out by parol evidence, if such parol evidence would change, add to, or contradict the writing."

(9.) Because the court erred in charging the jury as follows: "Caveators allege that Alfred Shorter made a will in 1881, and after said will had been signed and executed, he took from said will a part of the same which contained a devise in favor of Shorter College, and they insist that he inserted in said will another and different devise; all of which caveators insist was done when no witnesses to the will were present. I charge you that if this be shown by the evidence, then such an act would amount to a cancellation of that provision of the will so taken therefrom, and would cancel the entire will, if the cancellation of that provision would destroy the entire testamentary scheme; but if the destruction or cancellation of that part would not destroy the testamentary scheme of the testator as to the disposition of his property, then the remainder of the will would not be annulled by such

conduct. While it would be true that such change of a part of the will would annul that part of the same, yet if the testator, after making the will of 1881, took any parts of the sheets of the paper containing certain devises, and substituted others, and if the evidence should show that, after doing this, he made a codicil to the same will as changed by him, and if in said codicil he re-affirmed and republished said paper, as changed, as his will, then the effect would be to make said writing his will, and it would make no difference that such writing purporting to be the will of 1881, had been changed, if in truth the will as changed was re-affirmed and republished by the codicil."

(9½.) Because the court erred in charging the jury as follows: " Caveators further insist that said Alfred Shorter, after making his will, changed a bequest which said will contained, of $75,000.00 to $40,000.000, and that the same was done not in the presence of the witnesses to said will. If this be shown by the evidence, without more, I charge you that such change would render null and void that devise or bequest of the will. But if no such change was made, or if made, if testator, after making such change, made and executed in due form of law a codicil to his said will, as changed, and if in said codicil he re-affirmed and republished his will, then such republication would make the whole will legal and valid in its then condition; that is, if said will, at the time of making the codicil, contained a bequest of $40,000.00 which had been changed from $75,-000.00, then the bequest of $40,000.00 would constitute a part of said will."

(10.) Because the court erred in refusing to give the following in charge, as requested in writing by the counsel for caveators, to-wit: " If the testator has blood kin who could inherit, if he died intestate, any disposition of the main bulk of his property to others, not of the blood, is regarded by the law as an unnatural will, and more subject to suspicion and scrutiny than a will transmitting the property in the line of the blood or line of descent." The

court leaving out of its charge that portion of the above contained in the following words: " Is regarded by the law as an unnatural will, and."

(11.) Because the court erred in refusing to give in charge to the jury the following, as requested in writing by counsel for caveators, and in giving what he substituted therefor: " Donations in a will to the wife or children of a man who is the general and confidential agent and attorney at law of the testator, who has the general management, not only of testator's legal business, but of his other business in general, labor under the suspicion of having been obtained by an abuse of the influence such agent may have over his principal, the testator; and the more especially so if the donation be an extravagant one and to a person outside of the line of the blood or line of descent."

The court substituting for the above the following charge: " Donations, in a will, to the wife or children of a man who is the general and confidential agent and attorney at law of the testator, may be looked to by you to determine whether the will be natural or unnatural, and if unnatural, then the same would be under the suspicion of having been obtained by an abuse of the influence which such an agent may have obtained over his principal, and the more especially so if the donation be an extravagant one, and to a person out side of the line of the blood or line of descent." And caveators say that the court erred especially in making the suspicion attaching to such a donation depend upon its being, in the opinion of the jury, unnatural.

(12.) Because the court erred in refusing to give the following in charge to the jury, as requested in writing by counsel for caveators, to-wit: " If a party has such influ‑ence over a testator as to be able to control him in regard to the provisions of his will, and there are constant opportunities to exert that influence before and at the time of the making of the will, and the will makes unreasonable and extravagant provisions in favor of that party, or in favor of any member or members of the family of such

party, the inference is legitimate that it may have been the result of such influence. It is for the jury to determine whether it was or not."

(13.) Because the court erred in refusing to give in charge to the jury the following, as requested in writing by counsel for caveators, and giving what he substituted therefor: "Whatever might be the effect of the republication of a will by a codicil, generally speaking, or where the language used by the testator might be not inconsistent with an intention to adopt any alterations made since its first publication (as when he says in a codicil that he republishes a will 'bearing a certain date,' or, 'the foregoing will,' or, 'the foregoing pages,' or like language), whatever may be the effect in such cases, generally speaking, as to adopting any changes made in the will after its original execution, no such intention to adopt such alterations can be inferred, or even made out, by parol evidence, in a case like this, where to do so would conflict with the statement made and language used by the testator in making such republication in and by the codicil. To allow the republication in this case to set up and adopt material changes, such as the removal of whole pages, and inserting other page or pages, if the pages removed contain important provisions other than and different from the provisions contained in the page or pages so inserted, it would conflict with the statements made and language used in this codicil."

The court gave in charge the foregoing, except what is included in parentheses, until he came to the words "or even made out by parol evidence," giving said words in charge, together with that portion so requested that precedes, and refusing the balance contained in said request; but substituting for the balance these words, which he added to what he did give, to-wit: "If such parol evidence would change, add to or contradict the writing;" and caveators say the court more especially erred in substituting the words, "if such parol evidence would

change, add to or contradict the writing," in lieu of all the latter part or balance of said request.

(14.) Because the court erred in refusing to give in whole the following charge, as requested in writing by counsel for caveators, and in substituting and adding what he did give in lieu of a part thereof and in addition thereto, —the request to charge being as follows: " If the jury believe, from the evidence, that the will made and executed by Alfred Shorter, on the 18th day of July, 1881, witnessed by W. F. Ayer, J. C. McDonald and J. B. Hine, is set forth on and consists of the several pieces of paper now in evidence, marked and identified as pages 1, 2, 3, 4, 5, as contained in the instrument propounded for probate, and the pages marked and identified as pages 6, 7 and 8; said pages 6, 7 and 8 being further identified by having written across the face of each, these words. " Cancelled; and subsequent will executed. (Signed) Alfred Shorter," said pages 6, 7 and 8 not being contained in said instrument so offered; and also of the page now marked and identified as page 10; said page 10 being contained in the instrument so offered for probate, and said page 10 being further identified by the changing of 11 to 10 on said page (if they find said change was made). And, if the jury believe that said will also contained one other page not offered in evidence, and its contents not being shown, then they must find by their verdict that the instrument in writing now propounded for probate, if materially different, is not the last will and testament of Alfred Shorter, unless it be further shown that it was afterwards republished, or published as required by law. But the republication in the codicil, in this case, made in the language therein used, will not have the effect to adopt and set up any such important changes made, if they were made, in the will of July 18, 1881, after that date and before the making of the codicil."

The court gave that portion of the above which precedes and includes the following words: "If materially differ-

ent, is not the last will and testament of Alfred Shorter," substituting for the balance the following: "But if said will did originally consist of part of the will offered for probate, and part of other sheets of paper in evidence, or of sheets not found and not in evidence; yet, if, after making the will, the testator took from the will the sheets in evidence, marked cancelled, and other sheets, and if he substituted other sheets containing other and different bequests, and if the will thus changed, if such change took place, be re-affirmed and republished as his will, as changed, then such republication would make the will legal and valid."

(15.) Because the court erred in refusing to give in charge to the jury the whole of the following, as requested in writing by counsel for caveators, and in substituting and adding these words: "But whether the writing contains the number from 1 to 10, or from 1 to 11, would be for you to say from all the evidence," in what he did give in lieu of a part thereof and in addition thereto. The request to charge being as follows, to-wit: "In considering the question as to whether the document presented by the propounders as the will of Alfred Shorter, made July 18, 1881, is or is not, in whole or in part, the same document he in fact made and published on that day, and the same he republished in the codicil of July 10, 1882, as his will; if Alfred Shorter states in his will that the same is written on pages numbered from 1 to 11 inclusive, then no parol testimony can overcome what the will itself says as to the number of pages it was written on, and the court charges you that all that Col. Alexander, or any other witness, testifies as to what occurred or was said by Alfred Shorter, or between himself and Alfred Shorter, is parol testimony, and such as cannot be allowed to overcome what the will itself says as to the number of pages. Giving the weight which the law gives to the written statement contained in the will itself that it was written on pages numbered from one to eleven inclusive, if the jury shall find that the in-

strument presented by the propounders for probate was not written on pages numbered from 1 to 11 inclusive, and is not the will Alfred Shorter so made and executed, then the rule that parol testimony cannot contradict the writing applies again, when you come to consider whether Alfred Shorter, in making his codicil, did or did not ratify and republish the will as changed and altered, if you find it had been changed or altered. Said Alfred Shorter states, in the codicil to his will, that he ratifies the will he had made and executed on the 18th day of July, 1881, witnessed by W. F. Ayer, J. C. McDonald and J. B. Hine, except so far as changed by said codicil. The court charges you that no parol testimony can be allowed to contradict that statement made by Alfred Shorter in the will itself, nor to show that said testator meant to set up as his will what he had made or done after the 18th day of July, 1881. No amount of parol testimony can be considered for the purpose of contradicting either of these statements made in the will and codicil. Nothing can be probated in this proceeding, except the will he in fact made on the 18th day of July, 1881, without change, except as changed in the codicil, and this must be so, whether he was or was not unduly influenced in making his will, or any part of it."

The court gave that portion of the above preceding the words "numbered from 1 to 11 inclusive, then" and including those words, but refused the balance of said request, and gave as a substitute therefor and in addition thereto the following, to-wit: "Parol evidence would be inadmissible to change or alter the number of pages as written, but whether the writing contains the numbers from 1 to 10 or from 1 to 11, would be for you to say from all the evidence; any statements made by testator, if any were made, to Col. Alexander at the time of making the will would be parol evidence."

(16.) Because the court erred in refusing to give in charge to the jury the following, being requested in writing by counsel for caveators to do so, to-wit: "Alfred

Shorter, the testator, having made the written state-
ment in the codicil that he ratified the will made and
executed by him on the 18th day of July, 1881, if, after
July 18, 1881, any pages containing important provisions,
materially different from what was taken out, were put in,
then the republication by the codicil cannot make it a
good will as it stands, so altered and changed, even though
you should believe said Alfred Shorter made the changes
himself; for to allow the act of republication to set up
what was done afterwards, when he says himself in his
codicil that it is what was done then, on the 18th of July,
1881, that he ratifies, except so far as changed by the codi-
cil, would be to make him do another thing, and not the
thing he says he does in the writing. His written language
used in making the codicil will not allow other changes of
the will he made July 18th, 1881, except the changes made
by the codicil. No conversation or other thing that oc-
curred between Alfred Shorter and Col. Alexander, on the
10th July, 1882, when the codicil was made, or on the
Saturday prior thereto, or on any other day, as testified to
by said Alexander, can be used or considered to contra-
dict or change the statement in the will as to number of
pages, nor the statement in the codicil, ratifying the will
made July 18, 1881.

(17.) Because the court erred in refusing to give in
charge to the jury the following, being requested by coun-
sel for the caveators to do so, to-wit: "If they find that
Alfred Shorter states in the instrument propounded as his
will, that it was written on pages numbered from 1 to 11
inclusive, and that the will as originally executed and
published, and also as ratified and republished by the
codicil, contains this statement as to the pages it was
written on, the republication being a reiteration as though
testator had rewritten that statement on the day he exe-
cuted the codicil, the fact that it was written on pages
numbered from 1 to 11 inclusive, as stated in the in-
strument itself, cannot be contradicted or overcome by

any amount of parol testimony. No parol testimony to the effect that it was examined when republished and found not to contain eleven pages, and not to be written on pages numbering from 1 to 11 inclusive, can be considered by the jury to contradict the will itself. The jury must find it was written on the number of pages so stated in the instrument itself, no matter what witnesses may testify on that point. No amount of parol testimony can justify the jury in finding that the statement made in the will itself is not true, or that it was not written on the number of pages that it states it was, both when originally executed and when republished; and if the instrument now propounded for probate is not written on pages numbered from 1 to 11 inclusive, no parol testimony to the contrary can justify the jury in finding this to be the entire instrument originally made, nor the entire instrument as republished by the testator in making the codicil, and if any page of the writing which constituted the will of Alfred Shorter is gone, or is not found in the instrument propounded for probate, and it does not appear what the missing page contained, the other pages so offered cannot be probated without the missing page. If you find these facts to exist, you must find the document propounded is not the last will and testament of Alfred Shorter, and not entitled to probate; and this would be so, whether there was any undue influence or not."

(18.) Because the court erred in refusing to give by itself, as requested in writing by the counsel for caveators, the following charge; and also erred in adding thereto and coupling therewith the words which he did add: "If the propounders of this will have produced in court a book as the book referred to in the will, which is certified to on the book itself, by the testator, as the book so referred to in the will, then the jury would not be justified in finding that some other book, not so certified by the testator, is the book so referred to."

The court gave the above requested charge, adding

thereto the following, to wit: "I give you this last paragraph or request, in connection with the statement, that you may consider any paper, book or sheet of paper which has been produced on the trial and put in evidence, which may aid you in finding out testator's intention as to the disposition of his property, and to aid you in considering the question whether testator made any other wills, and the time when such were made."

(19.) Because the court erred in giving in charge to the jury the following, to-wit: "I charge you that a codicil is merely an addition or appendix to a will. It and the will to which it is attached become parts of one entire will or testament; and if the codicil is itself duly executed and attested as the law requires for wills, its legal execution and attestation applies to and renders effective the whole will as it exists at the time of making the codicil, and including all changes therein or additions thereto, which the testator may have made prior to the execution of the codicil, unless the evidence shows to the contrary. So, if you should find, in your investigation, that the sheets or pages before mentioned, namely, the 6th, 7th and 9th of the instrument propounded as the last will of Alfred Shorter, or any one or more of them, were not in the will when it was originally executed, but were afterwards, and before making the codicil, inserted in the will by the testator, with the intention of thereby making them parts of his will, then the legal execution of the codicil to the will, as thus amended or altered, rendered the whole will, including the additions or alterations, good and valid as a will, unless the language of the codicil, and the whole codicil, taken together with all evidence in the case, show that such was not the intention of the testator, but that his intention was to execute and republish the will as originally made, leaving out the alleged additions before mentioned."

(20.) Because the court erred in its entire charge to the jury as a whole.

The motion was overruled, and the caveators excepted.

WRIGHT, MEYERHARDT & WRIGHT; FORSYTH & HOSKINSON; R. D. HARVEY & SON; H. R. SHORTER; C. A. THORNWELL; J. M. SMITH, for plaintiffs in error, cited: On admission of parol evidence and declarations of testator, 1 Redf. Wills (2d Ed. 1866), b. p. 473, par. 39, 474, sec. 2, note 2; 5 Pick., 404; 13 *Id.*, 45; 7 Met., 188, 301; 24 Mo., 311; 6 Conn., 270; 3 Met., 423; 1 Jar. Wills (Ed. 1880), 708; 1 Johns. Ch., 281; 4 Wash. C. C., 265; 2 Johns, 31; 1 Vesey, 440; 1 P. Wms., 136; 30 *Ga.*, 167; 12 *Id.*, 156; 31 *Id.*, 200, 371; 45 *Id.*, 247, 538; 47 *Id.*, 455, 470; 8 *Id.*, 41; 14 *Id.*, 374; 50 *Id.*, 191; 62 *Id.*, 253, 257; 35 *Id.*, 151, 156; 8 Am. R., 667; Wigr. Wills (2 Am. Ed.); 11 Jurist, 111; 1 Greenl. Ev., §§398, 564; 1 Mer., 389; 5 B. & Adol., 129, 663; 6 N. Y., 380; 2 Atk., 239; 3 Sim., 24; 3 Ves. Jr., 306; 1 Ves., 230; 2 Ves. & B., 318; 10 Hare, 348; 6. T. R., 252, 354; 2 P. Wms., 157; 2 Vern., 625; 2 Wms., Ex'rs, (2 Am. Ed.), 867; 5 Cowen, 221; Ala. L. Jour., Dec., 1882, 361; 16 Am. Dec., (2 A. K. Marshall), 50; 12 Am. Dec. (11 John.), 201; 1 Greenl. Ev., §290; 1 Story Eq. Jur., §181; 6 Am. Dec., 53; 17 *Ga.*, 558; 26 *Id.*, 582; 15 *Id.*, 196; 36 *Id.*, 479; Abb. Tr. Ev., 129, 133; 1 Redf. Wills, 314–16; Code, §§2476, 2471, 2473, 2475; 64 *Ga*, 167; 65 *Id.*, 275; 66 *Id.*, 550, 738; 50 *Id.*, 181; 1 T. & C. (N. Y.), 442; 27 *Ga.*, 324; 16 N. Y., 9; 46 *Ga.*, 247; 12 M. & W., 600; 1 *Ga.*, 12–21.

On the missing pages, 1 L. R., Prob. Div., 154; 1 Redf. Wills (1866), b. p. 308; 5 B. Monroe, 58; 4 Bibb, 553; 4 Monroe, 423; 4 Dana., 220; 87 Pa. St., 67; 14 Bush., 434; 11 Wend., 227, 599; 101 Ill., 411; 41 Barb., 385; 40 Conn., 587, 589; 14 Vt., 425; 41 *Id.*, 59; 2 Mills (S. C.), 334; 2 Richardson, 184; 2 Binney, 406; 10 Yerger, 84; 31 Wis., 691; 62 Ind., 61; 1 Green Ch., 221; 3 Pick., 67; 120 Mass., 177; 40 Miss., 83; 8 Metc., 487, 490; Code, §§2400, 2431; 39 *Ga.*, 168; 13 *Id.*, 63; 14 *Id.*, 185, 195; 21 *Id.*, 13; 63:

N. Y., 460; Abb. Tr. Ev., 58 (note); 1 Jar. Wills, 48; 50 *Ga.*, 523; 24 *Id.*, 84; 31 *Id.*, 483.

On the codicil, 12 Mees. & W., 600; 5 Jur. N. S., 252, (S. C. 1 Sw. & Tr., 262); 1 Redf. Wills, 277, 518; 1 Jar. Wills, 267, 304, ; 2 Whart. Ev., 897; Powell Dev, 320, marg. p. 548; 35 *Ga.*, 151; 66 *Id.*, 738; 65 *Id.*, 275, 64 *Id.*, 167; Abbott Tr. Ev., 134, §87.

On unnatural wills and suspicious legacies, 2 Domat. Civil Law, Part 2, Book 3, Title 2; 1 Redf. Wills, 452, sec. 14, 521, 523; 20 *Ga.*, 720–8; 33 Ala., 148; 17 *Id.*, 88.

On continuance, 30 *Ga.*, 816; 39 *Id.*, 186; 27 *Id.*, 411.

Verdict wrong, 24 *Ga.*, 171; 48 *Id.*, 540.

On striking from grand jury, 65 *Ga.*, 678.

On new trial generally, 44 *Ga.*, 638, 643; 59 *Id.*, 722; 57 *Id.*, 607.

ALEXANDER & WRIGHT; UNDERWOOD & ROWELL; GEORGE HILLYER; J. H. REECE; C. N. FEATHERSTON; J. F. HILLYER; L. E. BLECKLEY, for defendants, cited: On admission of parol evidence, ambiguities and declarations of testator, 53 *Ga.*, 678; 1 Greenl. Ev., §564 and notes; 3 Burrow 1775; 1 Wms. Ex'rs, 130 (note); 63 *Ga.*, 146; 10 Burr., 100; 3 Humph., 284; 130 Mass., 96; 16 Gray, 99; 4 Strobart, 190; 6 Bing., 310; 2 Brod. & Bing., 314; L. R., 1 P. & D., 8, 201; 12 M. & W., 600; 1 Wms. Ex'rs, (6 Ed.), t. p. 252; 9 Jac. Fish. Dig., 13660, 13663, 13664, 13786, 13741; Wigr. Wi'ls, 252; 1 L. R. P., 546; L. R., 3 P. & D., 84 (S. C. 6 Moak R., 365); 1 Pow. Dev., 64; 18 C. L. J. No. 4, p. 68, note and cit.; 3 Phillim., 445, 434 and notes, 452–5; 3 Addams, 226, 232, 506, 509; 2 *Id.*, 286–9; 1 Haggard, 674, 289; 2 Phillim., 290, 416; 3 Curteis, 531–4; 3 B. Monroe, 390 *et seq.;* 1 Wms. Ex'rs (5 Ed.), 91 and notes, 312 *et seq.;* 1 Jar. Wills (4 Ed.), 358–9; 32 *Ga.*, 156; 1 Mason, 9; 1 Phillim., 130; 4 Bligh, 359; 1 Bouv. L. Dic., 97; 25 *Ga.*, 142; 14 *Id.*, 375; Code, §§2457, 3801, 2854; Jacob's

Dict., §§443, 445 ; 1 Freem., §292; 5 Rep., 68 ; Spen. Abr.,
part 10, voc. Testament ; Bridg., 105; Code, §§2757 ; 2
Vern., 98, 225, 625 ; Cowp., 53 ; Jacob's Dict. 2, §461 ;
2 Bac. Abr., 606, 607 ; 2 Vern., 593 ; 1 Johns., 360 ; 1
Br. Ch., 477 ; 3 Bac. Abr., 607 ; 3 Ves, Jr., 306, 308 ;
2 Vern., 593 ; 2 Br. Ch., 165 ; 3 Ves. Jr., 516 ; 5 *Id.*,
79 ; 6 *Id.*, 321 ; 7 *Id.*, 508 ; Leon., 18, *vide tit.* De-
vise, 1 Monr., 72 ; 3 Bac. Abr., 608, 609, 610–12 ; Mau.
& Sel., 299 ; 1 Barn. & A., 247 ; 6 Taunt., 14 ; 5
Barn. & A., 847 ; 6 T. R., 671 : 2 P. Wms., 141 ;
Dev. Eq. R., 286 ; Vern., 473 ; 1 Ves. Jr., 258 : 6 *Id.*, 398 ;
2 *Id.*, 465, 644 ; 4 *Id.*, 734 ; 6 *Id.*, 324 ; 7 *Id.*, 503–18 ;
10 *Id.*, 77 ; 2 Ves., 95 ; 2 Bro. C., 526 ; 1 Vern., 30 ; 2
P. Wms., 158 ; 5 Ves., 359 ; 3 Phillim., 461   130 Mass.,
96 ; 2 Addams, 286 ; 1 Haggard, 674 ; 3 Eng. Ecc. Rep.,
289 ; 1 Jar. Wills, 358–9 ; 1 Wms. Ex'rs, 312, 313, 91,
notes ; 2 Phillim., 290 ; 3 Add. (2 Eng. Ecc. Rep.), 232,
209 ; 4 Ves. Jr., 186 ; 2 Phillim., 48 ; 3 Addams, 626 ; 2
Haggard, 537 ; 3 Curteis, 636 ; 9 Jac. Fish. Dig., 13659,
13661–6, 13705–8 ; 68 *Ga.*, 830 ; 1 Greenl., §§297, 300 ; 25
*Ga.*, 142 ; Code, §§2248, 2472 ; 14 *Ga.*, 378 ; 23 *Id.*, 262 ;
31 *Id.*, 201 ; Code. §3804 ; 46 *Ga.*, 232–5 ; 63 *Id.*, 132 ; 16
*Id.*, 521 ; 8 Bing., 244 ; 3 Ves., 306 ; 14 *Ga.*, 377 ; 57 *Id.*,
181 ; 49 *Id.*, 102 ; 3 *Id.*, 557 ; 28 *Id.*, 262 ; 24 *Id.*, 338 ; 25
*Id.*, 141 ; 32 *Id.*, 343 ; 38 *Id.*, 648 ; 1 Jar. Wills, 362 ; 1
P. W., 425 ; Benj. Sales, 155–6 and cit. ; 7 Gill & John,
311 ; 5 Ind., 389 ; 1 Jar. Wills, 127, note ; 3 Bacon, 609 ;
5 Barn. & A., 847 ; 130 Mass., 355 ; 43 N. Y. L., 591 ; 60
How. P. (N. Y.), 422 ; 7 Ill. App., 24 ; 32 O., 313 ; 15
Wis., 144 ; 45 *Id.*, 211 ; 57 Ala., 440 ; 8 Oregon, 188 ; 42
Md., 410 ; 59 N. Y., 434 ; Code, §2754 ; 57 *Ga.*, 36 ; 61 *Id.*,
364 ; 48 *Id.*, 504 ; 43 *Id.*, 160 ; 13 Ves., 310 ; 36 *Ga.*, 70 ;
32 *Id.*, 160–3 ; 1 Haws., 247, 268–9 ; 38 *Ga.*, 562 ; Code,
§§2474, 2475 ; 1 Addams, 175, 411 ; 1 Jar. Wills, 374,
337–9, 340–1, 116, 123, note ; 16 Gray, 99 ; Code, §2478 ;
63 *Ga.*, 146 ; 3 Hagg., 570 ; 4 *Id.*, 410 ; 1 Jar. Wills, 89 ;
12 O. St., 381 ; 21 Md., 264 ; 2 Dall., 70 ; 2 Am. Prob. R., 27.

On the missing or revoked sheets, Code, §§2475, 2471; 11 C. B , N. S. (103 E. C. L.), 341; 1 Wms. Ex'rs, 134 and notes; 1 L. R., P. D., 154; 6 Mo., 177 (S. C. 34 Am. Dec., 134); 4 Mo., 211, 608; 1 Jar. Wills, 248, note y, 290, note; 3 Redf. Wills, note 7; 5 B. Monroe, 53; 1 Redf. Wills, 349, note; Jac. Fish. Dig., 13709, 13730, 13736; 1 Jar. Wills, 302, 291 and notes; 1 Wms. Ex'rs 101, 179, 180 and notes; 1 Pow. Dev. 518, 520 and notes; 1 Wms. Ex'rs. (6 Ed.), 201–3, 134 notes; 1 Jar. Wills, 338, 339 and notes; 1 Cowp., 187; 3 Mod. R., 203; Hard., 374 (S. C. Shaw, 146); 10 Bac. Abr., 547; 3 Barb. Ch., 165; 39 Am. Dec., 263; 2 Cowp., 812; 3 B. & P., 16; 4 East., 418; 1 P. Wms., 343; 2 Brad. & Bing., 314; 4 Burrow, 280–2; Reese's Man., 105, 106; 18 L. T. N. S., 301; 16 W. R., 673; 1 Rob. (Va.), 346 (S. C. 39 Am Dec., 263); 4 East, 418; 8 Cow., 56; 130 Mass., 95.

On the codicil, 1 Cowp., 132, 158; 35 *Ga.*, 151; 1 Add., 17; 1 Hill, 591; 3 B. Monroe, 390; 39 Am. R., 753; 1 Am. Prob. Prac. R., 516, 96; 2 S. & T., 474; 31 L. J. P., 190; 10 W. R., 848; 6 L. T., N. S., 474; 9 Jac. Fish. Dig., 13660, 13700, 13663; 1 Wms. Ex'rs, 212, 213, 224, 252; 1 Jar., Wills, 114 *et seq.*, 121, 189–91; 1 Redf. Wills, 368, (3), (4), 371, (6); 2 Notes of Cases, 406, 133, 79; L. R., 3 P. & D., 26; 5 Moak's Eng. R., 521; 12 Jur., 465; 1 Sw. & Tr., 494; 31 L. J. Prob., 197; L. R., 2 P. & D., 256; 2 Robert, 622 : 5 Notes of Cases, 293; 6 *Id.*, 183; 29 L. J. P. M. & A., 155; 6 Jur., N. S., 1165; 3 B. Monroe, 390; 4 Ves., 610; 5 Sim., 274; 4 DeG. & S., 475; 3 Beav., 460; L. R., 16 Eq., 19; 9 Ch. Dec., 231 and cit.; Enc. Relig. Knowl., 319, 320; L. R., 1 P. & D., 201, 258; 14 Pick., 534; 12 M. & W., 600; 77 N. Y., 369; 1 Add., 41; Code, §2478; 1 Pow. Dev., 94; 1 Red. Wills, 203, 209; 1 Jar. Wills, 217; 3 Burr., 1775; 1 Wms. Ex'rs, 130, note (x).

On pleadings and practice as to missing sheets, 14 *Ga.*, 362; 17 *Id.*, 417; 18 *Id.*, 473; 1 Brown's Ad. & Civ L., 453, 454; 4 Co., 29 A.; 7 *Id.*, 42 B.; Roll. Abr. S. 30; Code, §§4114, 4116, 3452, 3332; 47 *Ga.*, 205; 45 *Id.*, 144.

On fraud and undue influence, Nontes Prob. Trac., §§185, 92.

On striking from grand jury, Code, §§2925, 3630, 3925, 3926; 65 *Ga.*, 678; 68 *Id.*, 434; 64 *Id.*, 562.

On intention of testator, 1 Cowp., 52; 1 P. Wms., 345.

On continuance, 54 *Ga.*, 660-2; 61 *Id.*, 481; 59 *Id.*, 83, 660, 612, 189; 46 *Id.*, 273-6, 208; Code, §§3630, 3531, 3522, 3529, 3525; 1 Kelly, 213-15, 574; 45 *Ga.*, 283; 10 *Id.*, 85, 92, 403; 39 *Id.*, 591, 359; 41 *Id.*, 102; 53 *Id.*, 152; 33 *Id.*, 372; 14 *Id.*, 6, 22, 24; 18 *Id.*, 389; 5 *Id.*, 58, 52; 49 *Id.*, 215; 26 *Id.*, 500, 275; 47 *Id.*, 601; 38 *Id.*, 401, 491, 506; 64 *Id.*, 374, 404, 416; 24 *Id*, 297; 21 *Id.*, 11, 301-6, 492; 37 *Id.*, 101, 678-80; 42 *Id.*, 404; 15 *Id.*, 535; 68 *Id.*, 287; 55 *Id.*, 21, 47, 203; 51 *Id.*, 152; 60 *Id.*, 157, 237, 634; 58 *Id.*, 208; 57 *Id.*, 241, 351, 236, 435; 30 *Id.*, 829.

On general exceptions to charge, 67 *Ga.*, 153, 707; 68 *Id.*, 296, 836.

On new trial, generally, 1 Peters, 70; 37 *Ga.*, 101; 6 Cow. (N. Y.), 118; 2 Bing., 483, 2 T. R., 4; 24 Ill., 444; 58 *Ga.*, 485; 59 *Id.*, 738; 64 *Id.*, 448; 30 *Id.*, 958; 31 *Id.*, 671, 492; 37 *Id.*, 351, 236; 14 *Id.*, 43; 39 *Id.*, 360; 30 *Id.*, 220; 39 N. Y. C. L., 113; 45 *Ga.*, 94; Charlton, 281.

On alteration, 53 *Ga.*, 678; 45 *Id.*, 538; 17 *Id.*, 558; 26 *Id.*, 582; 15 *Id.*, 196; 31 *Id.*, 371; 36 *Id.*, 479; 1 Greenl. Ev., §564 and notes; 1 Jar. Wills, 205, 304; 1 Wms. Ex'rs, (6 Ed.), 168, 169; 1 L. R., 3 P. & D., 84 (S. C. 6 Moak, 365); 3 Veas. & Bea., 122.

*Falsa demonstratio non nocet*, Broom Max., 637 *et seq.;* Branch Principia, 112; 22 *Ga.*, 203; 62 *Id.*, 73; 17 *Id.*, 187; 58 *Id.*, 55; 5C *Id.*, 124; 56 *Id.*, 439; 19 *Id.*, 279; 14 *Id.*, 252; 2 Brod. & Bing., 314; 1 Jar. Wills, 205; 12 M. & W., 712; 20 *Ga.*, 689; 56 *Id.*, 643; Jac. Fish. Dig., 13664, 13660, 13786, 13741; 1 Mer., 384; 44 Am. R., 158, (S. C.; 76 Va., 149); 2 D. M. & G., 299; 6 Mad., 350; 1 Sim., 173; 41 Am. R., 493, S. C. 37 O. St., 126); 1 Jar. Wills, 760,

761, note (r); 76 Pa.. St., 197; 2 L. R., P. D., 111; 2 Jar. Wills, 751-5; 14 M. & W., 399.

Probate and construction, Wig. Wills, 114; 41 *Ga.*, 141, 142, 678; 53 *Id*, 255; 1 L R. P., 546.

Hypothetical will. 20 *Ga.*, 786; 93 Pa. St., 316; 15 *Id.*, 28.

JACKSON, Chief Justice.

The propounders exhibited a paper which they alleged was the last will of Alfred Shorter. The caveators, being the next of kin of the deceased, took issue, and alleged that it was not. The jury found on that issue with the propounders; thereupon the caveators made a motion for a new trial, and upon the denial of that motion error is assigned here.

On a careful examination of the whole record—of all the grounds of the motion for a new trial, except on matters of practice—we think that they turn upon a single point, and that is, whether the testimony of Mr. Alexander, the scrivener of the codicil. and the confidential legal adviser of Mr. Shorter in regard to its execution and the sufficiency of the original will to which it was a codicil to stand the test of legal investigation, was legally admitted.

If that testimony was admissible, the evidence is sufficient to uphold the verdict of the jury, if they gave it credit; if it was not admissible, and could not be considered by the jury, then the opposite conclusion would probably be reached in respect to a part, if not the whole, of the will.

The original will is numbered from one to eleven, inclusive, on the last page of paper propounded as such. On that page the testator says: "I nominate and appoint David B. Hamilton, Judge George Hillyer and Eben Hillyer to be executors of this, my will, to carry the same into effect according to law, and which will I have written on the above and foregoing pages, numbered from one to

eleven inclusive, and identified by my name on the margin." The last digit of the figure eleven, on a close inspection of it, with the aid of a glass, opens slightly, as if by the spreading of the pen, so as to leave a slight vacant spot in the middle, making quite an elongated cipher towards the lower part of the figure, not perceptible, however, to the naked eye of a man of my age at least, and is really, to all moral certainty, not a cipher but a digit, and the number is not the figure ten, but it is the figure eleven; and so I believe almost all, if not all, the witnesses on that point testify. The top of this page has the figure ten upon it, altered from eleven. On the margin of it, as on the margin of all the other pages of the document or paper, is the signature of Alfred Shorter plainly written. The preceding page has the figure nine plainly on its top, and altered from nothing else; no other figure ever was there. This page nine contains the residuary clause of the will, by which Mrs. Hamilton is made the sole residuary legatee, and on its margin also is plainly written testator's signature.

Page eight has been altered from some other figure, apparently from seven. It contains a forty thousand dollar legacy to the heirs of testator's sister, Mrs. Beeland, two other minor bequests, and a loan to a friend, while running a furnace leased from the testator.

Page seven is quite plainly numbered on the top, and the number is not made over any other, or changed at all from any other. It is the bequest to Shorter Female College.

Page number six is apparently altered from five, which once was marked at the top. It disposes of previous devises to married women in case of their death, giving it to the children, and making husbands trustees without bond, subject, however, to any will Mrs. Brooks may make or may have made ; and provides that if either owe him anything at his death, it is to be credited on the legacy, and if he builds on real estate given to any, the improvement

is to be accounted for at the price he charges in the book where he keeps such accounts, and if he sell such property, the legacy is not to lapse, but the money value is to be paid as entered in the same book.

Page five is unaltered, and states settlements as executor and trustee or guardian with Georgia E. Hillyer, Ellen E. Hillyer, Milton A. Cooley, Alexander T. Harper, Elizabeth H. Wright, Charles M. Harper and Armstead R. Harper, deceased, and that he owes them nothing.

Page number four is clean and unaltered, and contains a bequest to Charles M. Harper of certain real estate, and to Milton A. Cooley of other real estate, with provisions as to their power to sell and encumber the same.

Page number three is also a clear figure, and on that page are bequests to certain Hamiltons and Harpers and Mrs. Wright, and to Alfred S. Hamilton his undivided half interest in a store.

Page number two is also clean, and gives Mary Rhodes a store and railroad stock and bonds.

Page number one is unaltered, too, and gives Martha H. Brooks a store house and lot, railroad stock and bonds and forty-two hundred dollars in money; also Georgia E. Hillyer railroad stock and bonds and ten thousand dollars, and also to Ellen E. Hillyer railroad stock and bonds and sixteen thousand dollars in money.

The codicil, executed twelve months after the will, in July of 1882, the will having been executed the same month in 1881, declares that, " Being still of sound and disposing mind and memory, I, Alfred Shorter, do make the following codicil to the will made by myself on the 18th day of July, 1881, and attested by W. F. Ayer, J. C. McDonald and J. B. Hine. Said will is now ratified, approved and declared to be my last will in all respects, except in so far as the same is changed by this codicil." The codicil is on three pages, numbered twelve, thirteen and fourteen, and recites that, " Milton A. Cooley having died since the execution of said will, I now annul the bequest

made to him, and give Dr. Eben Hillyer, in trust for the widow and children of the said Milton A. Cooley, the store house and lot in the Coosa division of the city of Rome, occupied by Davis & Co., and known as the Crystal Palace, together with three thousand dollars of Rome water works bonds, and three hundred dollars of Rome city bonds, the latter known as twenty year bonds,—the income to be used for the benefit of the family, and the *corpus* to be divided equally between the widow and children, when the youngest of them becomes twenty-one years of age." On the fourth page of the original paper propounded, he had given to Milton A. Cooley, " the store house and lot on Broad street, Coosa division, city of Rome, known as the Crystal Palace, and now occupied by Davis & Co. as a dry goods store, without his having any power to sell, dispose of, etc., until his youngest child arrives at the age of twenty-one years." Sc that this codicil makes such reference to what he had given to Cooley as to show that when he executed the codicil he had in mind this clause of the will.

Next in the codicil, on the thirteenth page, he adds, " Being satisfied that the Shorter Female College is in present need of additional apparatus, furniture, instruments, etc., and the grounds about the college building need improvement, I give to the trustees of said college an additional five thousand dollars to be used under the direction," etc., thus making reference to the seventh page of the will, wherein he gave the trustees of that college forty thousand dollars' worth of bonds, with direction " that the *corpus* of said property, as above mentioned, be regarded as sacred, and forever set apart as a permanent endowment of the said Shorter Female College," and the income to be used in employing teachers, reducing tuition, assisting poor worthy students, keeping the property in repair, or in such other way as the trustees thought best to the interest of the college and education.

On the same 13th page of the codicil, he adds, " In addi-

tion to the specific legacies mentioned in my said will, I now also give to Mrs. Sallie Ansley, living near Social Circle, and who is the daughter of my half sister, the sum of five thousand dollars to her own use, and also the additional one thousand dollars to be expended in the education of her daughter, Sallie," etc., thus recognizing that he had made specific legacies in the will, and implying thereby a residuary legatee.

Then he adds, "I now repeat what has been stated in the body of my said will, that in all cases where legacies or bequests have been ·made, the same are to be charged with all sums of money or property which I may turn over to the beneficiaries respectively during my lifetime. The book referred to in my will, in which these various charges are made, will indicate the exact status of each when my will goes into effect," thus making reference to and identifying page 6, whereon this provision and allusion to the book of charges are seen in the will.

The original paper propounded as the will is holographic, written every line and word and figure by the testator, with every page identified by his signature on the margin, where figures on the tops of pages are altered, the alteration is plain, without any effort to hide what was done. The codicil is written by Mr. Alexander, and identified by the signature on the margin of each page; but the pages run into each other·in the codicil, a paragraph, or even a sentence, being partly on one and partly on another page, and not, in this respect, like the will, where all is concluded appropriate to a page on each page, and no broken paragraphs extend from one to the other page.

1, 2, 3, 4. I have been thus particular in reciting these facts to see whether these papers show such ambiguity as to let in parol evidence to explain it. It must be remarked that about the codicil there is no dispute. That those three pages were written at the request of the testator, read over to him and approved by him, admits of no controversy. If deceased had mind enough to make a will, if not under

undue influence, the codicil being executed in the presence of three witnesses, is a testamentary paper executed by the testator. Now, that paper itself recognizes the will, in so far as it recognizes parts of it. It refers unmistakably to things in the will. It refers to the Cooley legacy; to his death after the execution of the will, and annuls the legacy to him of a certain store-house, and gives that store-house to his brother-in-law in trust for the wife and children of deceased. It refers unmistakably to a general provision in regard to the credit of any advancements or buildings erected on property devised to be placed on the legacies or bequests given each legatee, and repeats what was said in regard to it in substance, and refers to the book as referred to in the will, where the charges of advancements, etc., would be found. It refers to the legacy to the Shorter College, in that it recognizes its immediate need of cash, and thus recognizes the provision in the will which tied up the *corpus*, and directed the expenditure of the income in other ways. It recognizes a residuary legatee, in that the codicil, "in addition to the specific legacies mentioned in his (my) said will," gave another specific legacy of five thousand dollars, and one thousand dollars to another relative. It refers to the will by its precise date, and by the witnesses who attested it; and in all these ways it, the codicil, tends towards identifying the paper offered to be set up as the will to which this codicil was made. Moreover, it is attached to the paper on which the will is written with brackets, and in this condition it is found in the possession of the testator at his death. These facts, we repeat, tend with force to show that the paper thus referred to in the codicil, and fastened to it, is the paper to which the testator had reference, and which he ratified, approved and declared to be his last will, and is the paper which was propounded as the will, and which the jury found to be his will. But the words, "in all respects, except in so far as the same is changed by this codicil," are relied upon to show that it is

not the paper referred to in the codicil, because the codi-
cil itself begins its paging with No. 12, thus recognizing
that will as having eleven pages, and when the will is in-
spected on its face, the testator declares it does have eleven
pages, and says that each page has his signature on its
margin, while, in fact, there are only ten pages of that pa-
per, and the last is changed from eleven to ten on the
top-paging.

The question thus arises, do not these two papers, thus
propounded together, present on their faces great ambig-
uity? Construed together, do they not? Construing
the will part, or rather, considering it by itself, is there
not ambiguity, uncertainty, doubtfulness about it? The
numbers of some pages untouched as originally written, of
others evidently and plainly, not at all disguisedly, al-
tered. The largest bequest being to itself on page No.
9, whose number was not touched, but stands precisely as
testator put it there, and being the residuary clause, thus
naturally coming before, immediately before, the execu-
tory clause, and being every word of it in testator's hand-
writing, and having his own sign-manual on the margin,
by itself, looks all right and genuine; and so do all the other
important legacies. All appear clear and pure; and the
apparent alteration of top page 11 to 10, and the statement
of the executor's clause, "I appoint . . . to be execu-
tors of this my will, . . . and which will I have writ-
ten on the above and foregoing pages, numbered from 1 to
11 inclusive, and identified by my name on the margin,"
alone throws the ambiguity, the doubt, the uncertainty
about either of the preceding legacies. Thus, on the face
of this will appears this ambiguity; and thus, when the
codicil ratifies and republishes it, referring to the date,
the witnesses, several bequests and provisions in it, and
identifies it to some extent as the will, yet it still leaves
the question, is it the whole will, still uncertain and am-
biguous. Parts of it might be set up and admitted to
probate on the two papers alone; the clear proof of the

codicil and all it contained, and the reference therein to the contents of the will, and the republication of it thereby, coupled with the very remote possibility that the missing page could have altered the validity and effect of parts of the original will, would admit to probate some, at least, of the bequests, but the ambiguity would remain to affect other parts of the will, and hence the question of the admissibility of the testimony of Mr. Alexander becomes important, if not vital,—if not to every part, yet to the will as a whole.

The will itself thus shows ambiguity, eleven being altered to ten on the last page, and the figures from one to eleven remaining unaltered in the body of the last page; but the codicil shows more clearly this ambiguity of the figures, in numbering its pages twelve, thirteen and fourteen. So that the face of the whole paper propounded makes an ambiguity needing explanation.

If Alexander's testimony be in and be credited, which is for the jury, then this trouble is explained, and no reasonable doubt can remain that the paper fastened to the codicil, with its ten pages, is in its entirety the will and the whole will of Alfred Shorter.

Outside of our own Code, what is the law touching the admissibility of parol evidence in case of such ambiguity as, in our judgment, appears on the face of these papers?

In 1 Williams on Executors, 6 Am. Ed., top p. 388, bottom p. 344, it is said: " But it must not be supposed that, by the ecclesiastical law, two witnesses were required to each particular fact, nor to every part of a transaction; for it often happened that to the contents of a will or to instructions there was only one witness, the confidential solicitor or other drawer; but there were and must have been adminicular circumstances to the transaction, such as the expressed wishes of the testator to make his will, the sending for the drawer of it, his being left alone with the deceased for that known purpose, some previous declarations or subsequent recognitions,—some extrinsic circum-

stances, in short, showing that a testamentary act was in
progress, and tending to corroborate the act itself." Citing
4 Haggard, 314; 1 Roberts., 173; 3 Curt., 125; 4 Notes of
Cases, 147; Dea. & Sw., 187; 52 N. Y., 517, in note Z.
And in the next paragraph on the same, and the succeeding
page, it is added : " In Moore *vs.* Paine, the testatrix was
entirely blind; there were three subscribing witnesses to
the will, but only one of them (viz., the writer, who was
of entire credit and wholly unconcerned as to the event
of the suit) could account for the instructions, for the read-
ing of the will to the testatrix and her approbation of it,
and for the identity of the paper ; the other two only depos-
ing to the publication of it by her as her will, but they did
not hear it read to her, nor did they know the contents of
it. The capacity of the testatrix was fully proved, and
that she had made a former will, which differed from this
chiefly in the *quantum* of the legacies, which were smaller
in that than in this. And Sir George Lee was, clearly of
opinion that this will was sufficiently proved ; and the
learned judge observed that the proof of wills with us is
by the *jus gentium*, and by that law one witness·is suffi-
cient. There should be, indeed, some adminicular proof
to corroborate the witness, which, in the present case,
arose from the conformity of the former to the present
will, and from a declaration which it appeared in evidence
the deceased had made, that she believed some of her re-
lations did not approve of her will, which was some sort
of recognition of this will. This cause was appealed to
the delegates, where the sentence was confirmed." 2 Cas.
temp. Lee 595.

Do not the remarks of this learned commentator on the
law in respect to the probate of wills, and to the effect
that all the attesting witnesses necessary to the execu-
tion of the paper need not be called to each part of the
transaction, to each particular fact therein, but that the con-
fidential solicitor who draws the paper is sufficient to prove
its contents, and to identify it as the thing which was made

his will by the deceased, apply to the case here? And does not the principle ruled in the case of Moore *vs.* Paine cover the point here? There the testatrix was blind, yet her will was set up on the testimony of the writer, who alone identified it as having been known to her, with nothing to aid his evidence but the conformity of the will on probate to a former will in some respects, and her remark that her relations did not like her will, " which was some sort of recognition of this will."

In the case before us, Mr. Alexander, in like manner entitled to full credit, and wholly disinterested, too, in the will, fully identifies it, just as it now stands, as the will to which testator referred in the codicil, and which he had entrusted to him to examine and see that it was all in conformity to law, at the same time that he gave him instructions to draw the codicil, which he did draw, and as the very paper which testator republished by the codicil as his will. He, Alexander, saw the mistake in paging, and mentioned it to deceased, who observed simply that it was a mistake; he read it to deceased by pages as it now stands, and it is the paper, the whole paper, which was bracketed with the codicil as one will, and was found to be the will of Alfred Shorter by the jury. The adminicular proof of identity is stronger than in Moore *vs.* Paine. References are made to the will in the codicil which unmistakably point to parts of it, and, with the evidence of Mr. Alexander, make an irresistible lodgment in a fair mind, that these papers, thus tied together, and together constituting the disposition which propounders allege the deceased made of his property, do in truth together express the wishes of deceased in respect to that property.

Suppose Alexander had been the scrivener who wrote the original will, and had attested it with two other witnesses, and had in like manner read it over to the deceased, and its identity had been questioned by reason of ambiguity on the face of the will, arising from the fact that the paging on the top of the pages did not correspond in

number with the summary of them by the testator in the executory clause, can it be doubted that he could be called simply to examine the paper and explain such an ambiguity and to identify the paper, though wrongly paged and with three pages altered, as the very paper he drew for deceased, and that which he and the other two attested; and when the jury believed what he swore and found for the will, his testimony being supported by adminicular proof, would not the proof uphold that finding as legal and sustained by sufficient proof of identity to remove the ambiguity

Well, the actual case before us is one where the deceased himself wrote a paper as his will; he gave it to Mr. Alexander, as his lawyer and confidential adviser, to prepare a codicil to it, and to inspect it and see that the paper was all right in law; he took it, examined it, found it right except this ambiguity of figures, read it over with that paging, as it is, to the deceased, word for word, and called his attention to the paging. Why may he not in like manner explain it, when by the codicil this paper is sought to be proclaimed and ratified as a will, as well as he could have done it had he prepared and witnessed the original paper? He was a witness to the republication of something by being a witness to the thing which republished that something. By witnessing the codicil which republished the will, he became a witness to that which proclaimed a certain paper to be the will. If he read over that paper to the testator, and knew its identity with the thing republished, why should he not identify it? Suppose that the spread of eleven into an elongated cipher thus, 1(), so as to make it read from one to ten, had been made by direction of deceased, and been altered from eleven to ten by him, could he not have explained how that was done and why? And so of the other altered numbers, could he not have told his client, the testator, that these alterations ought to be made, and make them by his direction, and thus explain the ambiguity and identify the

will? Assuredly. If so, why could he not make an explanation, less satisfactory perhaps,—its sufficiency to be left to the jury on the trial of identity, and to the court in reviewing the verdict, and that explanation to be weighed with such adminicular proof as was produced on the one hand and the appearance of the paper on the other, and thus the scales to weigh them, the law, to be applied and the sufficiency of the proof to be determined? We are really troubled to see why he may not.

In addition to the references of the codicil to the will as assisting links in the chain of identification, it may be added that loose sheets of what were probably parts of former wills, one made in 1878, as the proof shows, and attested by those who witnessed the paper now offered for probate in 1881, have bequests similar to those in this will, and marked cancelled; and it may be that the pages, with altered numbers, were taken from the former will and placed in this at a different place, and thus requiring a change of the figure. There are also circumstances, however slight, which strengthen the idea that the pages offered for probate compose the will of deceased. Taking the explicit and emphatic statement of Mr. Alexander, that there were but these same ten pages to the will which Mr. Shorter handed to him to examine, and adding to it the fact that he read it over to him carefully, page by page, to see what alterations Mr. Shorter wished made by the codicil, and then took it home, at Shorter's request, to see that it should be all right and the codicil should be prepared so as to fit in with it; and adding again the references made in the codicil to clauses of the will, which seem unmistakable, and references to the date and witnesses thereof, and the fact that it was then attached to the codicil and enclosed in the envelope addressed to the ordinary, and the same package was opened by Alexander and again identified as being the identical thing he sealed up and so addressed to the ordinary; and adding the fact that all the paper offered, every page, is in the handwriting of the deceased, and one

bequest, which was changed from another figure to forty thousand dollars, is also in his handwriting—it having been first carefully obliterated and then carefully re-written; and also the fact that loose sheets of what purported to be a former will, also in his handwriting, tend to the same point, in that they indicate, in the main, the same legatees and legacies of the same approximate sums of money or pieces of property, altered, as might be well supposed would be the case, when another will is made, as was the case here, and yet the female college which bore his name and which he controlled in life and loved till death, a favorite legatee all the time, in all loose sheets which are found in his handwriting, as in the paper propounded and the codicil thereto, and everywhere second only in his liberality, as in his affection, to the infant niece and name-sake of his dead wife, whom they raised from that infancy to her marriage, in their home, and whom, with her children and husband, he recalled to that home, vacated by that wife forever, to supply as far as possible a place never again to be perfectly filled, and yet so far filled that hers was the hand that smoothed his last pillow, and hers the breast on which he breathed his last sigh,—add all these facts to that clear testimony of this confidential legal adviser, and it seems to us they make a strong case to solve the ambiguity caused by the difference of count in the top paging numbers and the summary in the body of the executory clause or page of the paper, all in figures and not written full in letters, in favor of the fact being that the top numbers speak what truth demands, that eleven was changed to ten to show that truth, and as the deceased said when he summed up and counted, he must have made a mistake, and by inadvertence or the idea that it was a mere trifling mistake, he had neglected to correct it before, as he and Alexander, his counsel, both by their failure to correct it afterwards, showed that it was regarded as a mere trifle, and they make a strong case also to convince the mind that

the paper propounded is the will, the entire will, with the codicil, of Alfred Shorter. ·

So the same learned commentator (Williams), on top page 404, bottom page 353 of the same volume says: "In a court of construction, when the *factum* of the instrument has been previously established in the court of probate, the inquiry is almost closely restricted to the contents of the instrument itself, in order to ascertain the intentions of the testator. But in the court of probate the inquiry is not so limited, for there the intentions of the deceased, as to what shall operate as, and compose his will, are to be collected from all the circumstances of the case taken together." And there, 2 Add., 243; 2 Phillim., 426; 3 Sw. & Tr., 586, and other cases in note h, are cited. It is added: "They must, however, be circumstances existing at the time the will is made," citing 1 Robert, 661, 668; and 6 Notes of Cases, per Sir H. J. Fust in note i. We apprehend that the circumstances existing when the codicil is made, which republishes the will, come clearly within this limitation upon the rule here made, especially when the scrivener of the codicil is the lawyer and confidential adviser of the testator, and was employed by him to examine closely the will, and see that it complied with the law.

Also, in the same volume, the fact that the codicil and will are attached, it is said, is significant on the matter of republication of the latter by the former. On top pages 251–252, bottom pages 212–213, the author says: "A codicil will amount to a republication of the will to which it refers, whether the codicil be or be not annexed to the will, or be or be not expressly confirmatory of it. . . . But, although the effect of a codicil, as to republication, is by no means dependent on its being annexed to the will, yet if there are several wills of different dates, and there be a question to which of them the codicil is to be taken as a codicil, the circumstance of annexation is most powerful to show that (it) was intended as a codicil to the will to

which it is annexed, and to no other," citing 1 Add., 41; 1 Vesey, Jr., 490.

It is true that, in the case now before us, no other completed paper contests with that propounded the fact of being the entire will of the decedent; but the contest is that one page is missing from the paper propounded, and it takes that page to make this paper complete. Yet if the pages, as they now stand, numbered as they are, but ten pages as now offered for probate, be annexed to the codicil, is not that circumstance equally powerful that the codicil was intended to be a codicil to those ten pages so annexed, as the complete will of Alfred Shorter?

The learned commentator, moreover, goes further and adds: "A codicil referring inaccurately to a will may republish it." And as authority for this *dictum*, he refers to the case of Janson *vs.* Janson, cited by Sir John Nicholl in Rogers *vs.* Pittis, 1 Add., 38, where the deceased had "executed two wills, the one dated the 21st of July, 1792, and the other dated the 18th July, 1796," and "made a codicil in 1820, referring in terms to his will, not of the twenty-first, but of the first of July, 1792; and it was held that as the other circumstances of the case showed that the codicil referred to the will of 1792, and not to that of 1796, the inaccuracy was immaterial, and the will of 1792 was therefore republished." The principle thus ruled is, that "other circumstances of the case"—that is, extrinsic circumstances, which must have been shown by parol evidence— would operate to annul the last will, made in 1796, and to set up in lieu of it one made in 1792, notwithstanding that the date of the latter, as referred to in the codicil, was erroneous. The question was one of identity of the will to which the codicil referred, and these circumstances were admitted in evidence to show that identity, though the face of the codicil contradicted it. So here the question is the identity of these ten pages with that will to which this codicil refers, and all "the other circumstances of this case" may be let in to show the identity of the

paper propounded with that referred to, and republished by this codicil, though it may contradict°one enumeration of paging in that paper. The only difference is, that in this case the inaccuracy is in the will, while in that cited by Sir John Nicholl it was in the codicil; but, inasmuch as both will and codicil were under consideration at the same time by the deceased and his confidential adviser, it is not easy to see a rational distinction between the two cases, so far as the admissibility of the circumstances of each case is concerned on the point of identifying the paper referred to in the codicil. Besides, this ambiguity of figuring is carried from the will into the codicil by the paging therein too, which paging is numbered 12, 13, 14, as if 11 were the number of pages in the will. So that here the inaccuracy is in the codicil too, as well as the will, thus making this case closer akin to that cited and approved by that eminent judge, and by this no less learned and eminent commentator, so recognized repeatedly by the entire English bench.

But, outside of these principles deduced by Williams from the authorities examined and cited by him, the court of appeals in England, on questions of this sort, in the case of Sugden and others *vs.* Lord St. Leonards and others, in Vol. I., Probate Division of the Law Reports, p. 154, has adjudicated all these questions in respect to the admissibility and sufficiency of proof of contents, even of a lost will, by a single witness. The principles there ruled are, that "the contents of a lost will, like those of any other lost document, may be proved by secondary evidence; that declarations, written or oral, made by a testator, both before and after the execution of his will, are, in the event of its loss, admissible as secondary evidence of its contents; that the contents of a lost will may be proved by the evidence of a single witness, though interested, whose veracity and competency are unimpeached; and that when the contents of a lost will are not completely

proved, probate will be granted to the extent to which they are proved."

It is true, that probate was there asked of a lost will, and the contents were proved by this evidence as secondary, but, if to prove that the contents were known to the testator required three witnesses, though the will were in writing and not lost, be the law or rule of evidence, much more ought it to require three witnesses to prove those contents if the writing be lost. So we take it that this ruling means that a single witness may show that the contents, and all the contents of any will, whether in existence or lost, were known to the testator, and that in a codicil he referred it and republished it. At all events, that any ambiguity or doubt about those contents arising on its face may be explained by the one witness, who was testator's confidential adviser, so as to identify the will.

It will be observed that the ruling in this great case goes to the full extent not only of admitting all that transpires between the testator and his confidential adviser in the examination and execution of papers as his will or codicil, or both, at the time of execution, but of admitting the statements of testator both before and after their execution. Chief Justice Cockburn in delivering the opinion of the court, says: "He must be taken to know the contents of the instrument he has executed. If he speaks of its provisions, he can have no motive for misrepresenting them, except in the rare instances in which a testator may have the intention of misleading by his statements respecting his will. Generally speaking, statements of this kind are honestly made, and this class of evidence may be put on the same footing with the declarations of members of a family in matters of pedigree, evidence not always to be relied upon, yet sufficiently so to make it worth admitting, leaving its effect to be judged of by those who have to decide the case. It is upon this principle, I presume, that the declarations of a deceased testator have, in more instances than one, been admitted as evidence. Thus, they

have been admitted, as in Doe *vs.* Palmer, 16 Q. B., 747, to negative the presumption arising from interlineations appearing on the face of a will, that such interlineations have been made subsequently to the execution of the will," etc.

And then the Chief Justice adds, in the same case and immediately thereafter: "The question before us is, whether the statements made by a testator as to the provisions of his will can be received as evidence of the contents of a will known to have existed, but at his death is no longer forthcoming. That morally such statements and declaration are entitled, where no doubt exists of their sincerity, to the greatest weight, cannot be denied; and I am at a loss to see why, when such evidence is held to be admissible for the two purposes just referred to, it should not be equally receivable as proving the contents of the will." The other purpose, besides the explanation of interlineations referred to by the Chief Justice, for which the statements had been held admissible, is such as "when I am dead you will find my will in such a place," or, "I have left my estate of Blackacre to my son John;" or, "I have left 5,000£ to my daughter Mary;" and the conclusion which the high appellate court in England on matters of probate reached is, that the whole contents of a lost will might be proved in the same way by similar statements, on the question of · its *factum* and the identity of its contents when made.

In Doe *vs.* Palmer, referred to in that opinion, the admissibility of such evidence was confined to declarations made before the execution of the will, but the rule was extended in the case of Lord St. Leonards' will to statements after its execution. It is to be noticed, too, that the will in that case—Doe *vs.* Palmer—was not lost; but the question was upon interlineations and erasures in the written will produced. Were these alterations made before the will was executed, was the question; and the court, allowing that the presumption is that they were

made afterwards, admitted the statements of the testator to rebut that presumption. So in the case now before us the question is, was the alteration of the figures 11 to 10 made before or after the execution of the will, or of the codicil which.republished the will, and was the alteration in the top numbers of other pages so made, and was thus the true number of pages ten, or was it eleven, at the time this codicil was executed, notwithstanding the figure 11. remained unaltered in the body of the page ; and was the statement of the testator to Mr. Alexander at the very time the codicil was read to him, to the effect that he must have made a mistake in that enumeration, and ten was the true enumeration, and the fact that he, Alexander, the Saturday before, read the ten pages, every word of them, and them only, to testator, was this evidence also admissible to show the identity of these ten pages with the whole will testator had executed the year before, and which he republished when he executed the codicil? If interlineations and erasures, going to prove material bequests in a will may be thus explained, why not an ambiguity or doubt touching the identity of the paper as the whole will, arising not out of ambiguous words or sentences, or other material writing, but the number of pages in figures summed up, ten altered from eleven in one place, and an unaltered eleven in another, be likewise so explained? The human mind is ingenious to find out many inventions, but it is not easy for a plain, open, fair mind, seeking truth, to reject the statements in the one case and admit them in the other.

The case of Sugden *vs.* Lord St. Leonards was decided by the entire bench, composed of the Lord Chancellor, Lord Chief Justice, Master of the Rolls, and six other judges, making the court of appeal in probate cases in England in the year 1876 ; and in 1880, it was followed by the case of Gould *vs.* Lakes, 6 Vol. Probate Division, p. 1. Where it was ruled that, "Statements of a testatrix, whether made before or after the execution of the will,

are admissible to show what papers constitute the will."
And this is not the case of a lost will, but of whether a
certain sheet was part of a will, very similar to the case
at bar. In Gould *vs.* Lakes, a sheet was alleged as not
being part of the will; in this case at bar, a page is alleged
to be missing. In that case, on the death of deceased,
her will was found in her writing desk in an envelope,
which had been apparently thrice opened and resealed.
With the exception of the attestation clause, it was all
in her own handwriting, and contained in two sheets of
old fashioned note paper, one within the other, and stitched
together bookwise. Upon the first page of the outer sheet
were the words:

"I appoint my two nephews, Robert John Gould and Robert Gould
Lakes, to be my joint executors to carry my will into effect. I ap-
point my nephew, Robert John Gould, to be my executor and sole
residuary legatee, Martha Rashleigh, and placed with my will the
1st day of August, 1872. Stanley Lodge, Exmouth."

The second side was blank, and the next four pages
after the blank page, viz., the whole of the inner sheets
were paged 1, 2, 3, 4. On 1, 2 and 3 were legacies.
Page 4 was as follows:

"I bequeath to my step-son, Sir Colman Rashleigh, Baronet of
Prideaux, Luxulian, Cornwall, the sum of 5000£. I declare this to
be my last will and testament, and in witness hereof, I hereunto set
my hand and seal this 1st day of August in the year of our Lord,
1872.

(Signed)                      MARTHA RASHLEIGH.

Signed, sealed and declared to be her last will and testament by
the said Martha Rashleigh, the testatrix, in our presence, who, in
her presence, and in the presence of each other at the same time,
subscribe our names as witnesses."

And then signed by the witnesses." "The next page of
the document, *i. e.*, the inner side of the outer sheet, was
a blank, and the outer side of all contained the endorse-
ment: 'The will of Martha Rashleigh, August 1st, 1872.'
Neither of the attesting witnesses were able to say whether
the will was contained in one or two sheets of paper, or

to recollect anything, except that it was duly executed in their presence.   Mr. Tremayne (one of the witnesses), who had read the will before its execution, and who had filled up the attestation clause at the request of the testatrix, had no recollection whatever of its contents.   It appeared, however, that before the execution of the will, the testatrix repeatedly expressed orally and in letters her intention of making her nephew, Robert John Gould, her executor and residuary legatee, and it further appeared from declarations of the testatrix, contained in letters written after the execution of the will, and in declarations repeated by her shortly before her death, that she believed she had given effect to this intention in her will."

So that the point was clearly made whether statements of the testatrix, both before and after the execution of a will, were admissible to show what papers constituted the will which was executed and published by the testatrix ; and it was held by Sir James Hannen, the president of the court, that the case of Sugden *vs.* Lord St. Leonards covered and controlled the point.   He says : " But I am also of opinion that statements made by a testator after the making of the will, not merely with reference to the contents of the lost instrument, but with reference to the constituent parts of it are admissible.   That has been decided by the court of appeal in Sugden *vs.* St. Leonards, and there is no distinction between this case, where the question is what formed part of the will, and the case where the whole will is lost.   .   .   .   The present question is, whether these two papers were joined together, or were before the testatrix at the time she signed.   But the questions of law would not be different if the suggestions were that the first sheet was a forgery or an interpolation by somebody after the event.   In such a case, could it be said that in order to establish that this sheet was a genuine part of the will, evidence could not be given of a statement of the testatrix before she made the will, that she was going to dispose of her property in the manner in which

it appears to be left in the paper alleged to have been interpolated. And, in my opinion, it is also the law that statements to the same effect subsequent to the making of the will would also be admissible to show what was the state of the testatrix's mind and intentions, just as it would be an ingredient in the consideration whether or no a supposed interpolated sheet were a part of the will at the time of its execution.

"I think that the case is governed by the decision of the court of appeal in Sugden *vs.* St. Leonards, and that any statements of the testatrix, whether made before or after the execution of the will—for I see no distinction between them—are admissible in evidence, with a view of showing what were the constituent parts of the will."

When it is borne in mind that the author of this opinion is the author of that appealed from in Sugden *vs.* St. Leonards, and that the opinion there was affirmed with high encomiums upon the learning and ability of Sir James Hannen by that appellate court, it would seem to us that the construction he put on the former case must be correct beyond all cavil and dispute. And what is that decision, as applied to the case of Gould *vs.* Lakes? It is that parol evidence is admissible to show what papers—what sheets and pages of a paper knit together—constitute a will executed in the presence of witnesses who could not swear to the identity of the papers at all ; that statements of the testator, both before and after the execution of the will, both written and oral, are admissible to establish the constituent parts of the will, and identify certain papers as the will, when none of the witnesses to it could identify those parts to be part of the will.

In the case before us, the point for the propounders is much stronger. It is whether the statement made by the testator to the scrivener of a codicil to the will, who was also instructed to examine the legality of the will itself, is admissible to show that ten pages fastened together are the will, and the whole will of the testator, there being

some confusion about it on account of the number of pages stated to be in it, and the attention of testator having been called by the scrivener and confidential adviser to that confusion of numbering the pages?

In Gould *vs.* Lakes the question was, did the outside sheet make part of a will it enclosed, whose pages were numbered 1, 2, 3, 4, thus not counting that outside sheet at all; and testimony, not of Tremayne, who was the witness and officer who wrote the attestation clause of the will, but of anybody who heard testatrix express herself touching the contents of that outside sheet as part of the will, was admitted to show that it was part of the will. In this case, the question is, did another page, marked 10, constitute part of this will when executed, or when executed, was it just as it is now? And the testimony of Alexander, the scrivener and confidential adviser of testator, was admitted to show that no other number 10 was in testator's will when executed, but the whole will, just as it now stands, is the only will executed and republished by the explicit statement of testator to him, when each page was read over to testator, and scanned by Alexander to see what changes he wished made, and was recognized by him as his full and complete will, and that, too, when the confusion about a possible missing page was made known to the testator by the witness.

It is inconceivable, if such testimony be admissible at all, that a stronger case for its admissibility and sufficiency to identify the constituent parts of a will, by the recognition of each and all the parts by the testator, can be made by any set of facts.

So in the case of the Goods of Braddock, 1 Probate Div., L. R., p. 433, it was held that a codicil was entitled to probate, where the witnesses to its execution signed their names on the back of a will to which the codicil was attached with a pin, upon evidence *aliunde* that the papers were attached with the pin when the codicil was executed, and that the intention of the witnesses, by their subscrip-

tion on the back of the will, was to attest the signature of testatrix at the foot of the codicil.

See also Dickinson *vs.* Stidolph, 2d O. B. R., New Series, p. 339, which is to the effect that where two memoranda are referred to and only one found, that found will be given effect, the contents of that lost being uncertain; "for (say the court) either the ordinary presumption will be applied, that the missing paper was destroyed *animo revocandi,* or the principle must be applied, that the apparent testamentary intentions of a testator are not to be disappointed merely because she made other dispositions of her property, which are unknown, by reason of the testamentary paper which contained them not being forthcoming. It is on this principle that a subsequent will is no revocation of a former one, if the contents of the subsequent will are unknown. And the law is the same, even if the later will be expressly found to be different from the former, provided it be unknown in what the difference consists."

See again notes to 3 Phill., 434 (444–445, top pp.); Blackwood *vs.* Damer and Lord St. Helens *vs.* the Marchioness of Exeter; Fawcett *vs.* Jones, *Ib.,* top p., 455, *et seq.;* Bayldon *vs.* Bayldon, 3 Addams, 509; and Travers & Edgill *vs.* Miller, *Ib.,* 506; Greenough *vs.* Martin, 2 Addams, 239, top p. 286. In the last named case, it is expressly ruled by Sir John Nicholl that "in a court of probate, what instruments the testator meant to operate as and compose his will, is to be collected from all the circumstances of the case." •In Draper *vs.* Hitch and others, 1 Haggard, 674, top p. 289, the same principle is ruled by the same judge, that parol evidence is admissible in a court of probate to explain an ambiguity on the face of the will, but the facts proved must completely remove the ambiguity.

So in Methuen *vs.* Methuen, 2 Phillim., 416, top p. 290, ·the same judge ruled that "the same rules do not apply ·in a case relating to the *factum* of a will which would apply if the inquiry were concerning the construction of it. In the court of probate, the whole question is one of

intention; the *animus testandi* and the *animus revocandi* are completely open to investigation in this court. Suppose that in a case of fraud, or in a case of error, the residuary clause is omitted, it may be inserted by the court. It is admitted, that if there is doubt on the face of the papers, the court may admit parol•evidence." So in Rees *vs.* Rees & Rees, 6 Moak's Notes, 365, 3 Prob., and Div., 84, it was held by Sir J. Hannen that where "the will of deceased had been engrossed by a law stationer on fifteen brief sheets of paper consecutively numbered; on the sixteenth sheet the testator had written a codicil, and on the eighteenth and last a schedule of property referred to in the will; on the death of testator, it was found that the original fourth sheet had been removed and placed loose in his desk, and that the original seventeenth sheet had been used in substitution of the fourth by the testator, and the several sheets were tied together with tape; the legal presumption that papers bound together, and constituting the will as found at testator's death, was not rebutted by the circumstances of the case."

But it would seem to be useless to follow the adjudications further on the subject of the admission of parol evidence to explain ambiguities, outside of this state. The question also arises whether, though the will, as executed in July, 1881, may have been altered by the testator after that execution, yet if republished by the codicil by being referred to therein and annexed thereto, it is not made valid thereby. Such is the law conceded by the caveators, it is believed; but whether so conceded or not, such is the law. See 1 Jarman on Wills, bottom page, 114 *et seq.*, top p. 260 *et seq.*; 1 Williams on Ext'rs, bottom page 212, top p. 251; 1 Redfield, 368 (3), (4), 371 (6); 2 Notes of Cases, 406; 4 *Ib.*, 79. It is true that "an unexecuted alteration in a will is not rendered valid by a codicil ratifying and confirming the will, unless it be proved affirmatively by extrinsic evidence that the alterations were made before the codicil," which shows that the proof may be made by

extrinsic evidence, and if so made the alteration will be made valid. 1 Jarman, bottom p., 121, and cases cited. See also the Goods of Sykes, 3 Prob., and Div., 26, 5 Moak's Eng. R., 521; 3 B. Monroe (Ky.), 390, and cases there cited; 1 Burrow's R. 1549, Carltom, ex dem. Griffin, vs. Griffin; 16 Vesey, Jr., 167; 1 C. & M., 42; 1 Ves. & B., 445.

These references to able text-books and cases decided show that by the English law parol evidence is admissible, first, to explain certain ambiguities, for the most part latent; secondly, to show what papers constitute a will offered for probate, with the attesting clause and witnesses signing according to law; thirdly, that this parol evidence may show the identity of the will with the paper propounded, by statements of the testator at the time of the execution, before the execution and after the execution; fourthly, that greater latitude is given to the admission of parol evidence on issues of probate than of construction of the will after probate; fifthly, that a codicil, expressly affirming a will which could not convey realty, or was illegally executed, if that codicil be legally executed, made the will valid, especially if annexed to the will; and sixthly, that a will identified, in part, will not be refused probate as to that part, because of the uncertainty of other probable parts, the contents of which lost or missing parts are unknown. And these adjudications are not affected by or based upon any statute of Victoria or other modern law, but are constructions of the old law.

How do the Georgia statutes and adjudications of this court affect this law? So far from detracting from its force, we think that the laws of this state not only affirm it, but enlarge its scope in many respects.

On the question of the admissibility of extrinsic and parol evidence, the Code of this state greatly enlarges it to explain ambiguities. Section 2457 provides that "when called upon to construe a will, the court may hear parol evidence of the circumstances surrounding the testator at

the time of its execution, so the court may hear parol evidence to explain all ambiguities, both latent and patent."

So section 2472 declares that "the destruction of a will, expressly revoking all former wills, does not revive a former will, unless subsequently republished. In such cases the republication may be proved by parol;" that is, a dead will may be brought to life by parol. So in section 2431 it is declared that, "if a will be lost or destroyed subsequent to the death, or without the consent, of the testator, a copy of the same, clearly proved to be such by the subscribing witnesses and other evidence, may be admitted to probate and record in lieu of the original; but in every such case the presumption is of revocation by the testator, and that presumption must be rebutted by proof." What sort of proof? In *Kitchens vs. Kitchens*, 39 *Ga.*, 168, this court construed the last cited section, and held that the presumption could be rebutted by any such proof as clearly satisfies the conscience of the jury, either by the subscribing witnesses, or any other competent testimony, and in case of conflict, the jury must decide, and that where there is evidence to sustain the verdict in such a case, a new trial should not be granted. Chief Justice Brown, in delivering the opinion, says that "the facts may be proved by such other evidence as satisfies the conscience of the jury" that the presumption is rebutted; and adds: "Indeed, it very rarely happens that the three subscribing witnesses hear the will read, or know anything of its contents. And, on the other hand, it frequently happens that some friend of the testator does know the contents of the will, who is not a subscribing witness, while others may know what disposition has been made of the will since the testator's death."

Thus the court there opened the whole question of *devisavit vel non*, coming virtually before it on the immediate issue of *revocavit vel non*, to the introdution of *aliunde* and parol testimony. And in *Cobb vs. Jones*, 34 *Ga.*, 458, the declarations of the testator, both before and after the ex-

ecution of the will, were let in to show intention to defeat the statute against the manumission of slaves.

So in *Patterson vs. Hickey*, 32 *Ga.*, 156, five years before *Cobb vs. Jones*, this court held that " where the question is *revocavit vel non*, parol evidence as to the acts and declarations of the testator is admissible, although made at any time between the making the will and the death of the testator." Chief Justice Lumpkin, delivering the opinion, says : " *Revocavit vel non* is similar to the question of *devisavit vel non*, and is a question of fact for the consideration of the jury," citing Powell on Devises, 6, 34, and 3 Wilson, 508. He adds that, " all the courts agree that declarations made prior to, or at the time of the execution of the will, or its revocation, are admissible. The judicial mind, both in England and in this country, is divided as to whether it should not be so restricted. In some of the earlier English cases, as in Nelson *vs.* Oldfield, 2 Vernon, 76, this kind of evidence was admitted without question." And he also cites Lord Mansfield and Buller, J., in Brady *vs.* Cubitt, Douglas R. 49, to the effect that parol and every kind of evidence is admissible on such issue of fact. And after reviewing other English and many American decisions of eminent judges in this country, our own first Chief Justice thus announces the conclusions of his own mind : " Having thus, as briefly as I could, adverted to the conflicting decisions upon this vexed question, James Kent and Joseph Story, men unsurpassed for legal learning, being arrayed against Ambrose Spencer and Thomas Ruffin, to say nothing of Spencer Roane, than whom abler common law judges never presided in the courts of this country, and differing as I do from a worthy brother and associate, for whom and for whose opinions I have the highest respect, I must say that I have not a scintilla of doubt resting in my mind, that the testimony excluded should have been received by the circuit court."

So that it appears from this case of *Patterson vs. Hickey*, decided in 1861, that this court unanimously reached the

v 70-41

conclusion arrived at in 1876, by the highest appellate court in cases of probate in England in Sugden *vs.* St. Leonards; and thus it is seen that the two first principles deduced from the English authorities are sustained and enlarged by our own statutes and our court in construing our statutes and those English cases.

Equally clear is the Georgia statute on the subject of the effect of the execution of a codicil on a will to which it is annexed. Section 2478 of the Code declares : " A codicil, properly executed and annexed to a revoked will, shall amount to a republication of the same. Any writing executed with all the formalities required for a will may operate as a republication. A republication of the same paper in the presence of three witnesses, who shall subscribe as additional attesting witnesses, shall be good. A parol republication in the presence of the original witnesses to the will shall be good."

Does not the spirit of this statute give the English adjudication on the same subject full force? Does it not enlarge the scope of that adjudication? It strikes us that it does. A codicil properly executed, if annexed without more, republishes that will. What will? Why, the thing annexed. Any writing properly executed may so operate as to republish. A republication of the same paper in the presence of any three witnesses who attest it additionally, will do, and a parol republication in the presence of the original witnesses will do.

In *Jones vs. Shewmake*, 35 *Ga.*, 151, where the question was, whether lands acquired after the will but before the codicil passed by the will, this court held, Judge Lumpkin again delivering the opinion, that "*prima facie*, the execution of a codicil to a will of lands, so executed itself as to be capable of passing lands, is a republication of the original will, and the effect of such republication is to make the will operate in the same manner as if executed at the time of such republication, unless a special intent is manifested in the codicil

to restrain such operation and give it a less extensive effect. In other words, it brings down the will to the date of the codicil, making the will speak as if of that date. That is, both will and codicil should be taken as one entire instrument." As the law of Georgia then stood, after acquired lands did not pass by a will—since altered by our Code— so that the effect of that decision is that, by virtue of the execution of the codicil in the presence of three witnesses at that time and to that instrument, the will operated to take hold of and convey property which before it could not touch and did not convey, and that the execution of the codicil moulded itself into the will, making the twain one flesh, and thus vitalized what was dead when the will stood alone. If one palsied limb of the will were thus restored, why not another, two limbs, the whole body of it? So that the question here is still nothing but one of identity. If the paper given by the testator to Alexander, as a will previously executed, for his examination and the addition of a codicil to it, be the paper propounded here now, even if altered since its original execution, it became one instrument with the codicil, was vitalized by it so as to bequeath and devise Shorter's property, and was republished and made valid just as effectually as if it had been then re-executed itself. If a will, the whole of which had been killed dead, to use Judge Stephens's language in *Lively vs. Harwell,* 29 *Ga.*, 515, by revocation, cancelling, obliteration, may be revived, why may not a cancelling or obliteration or destruction of part of it—a sheet or page—be healed by the same means? If the republication of it, as first executed and all annulled, by a codicil attached, and expressly ratifying and affirming it can revivify all, why may not the same mode of republication by codicil revivify just as many pages of it as the testator then wished to make with his codicil as one complete will? So this decision covers the rule in England.

So that the question comes to this, the same point: Conceding that after the execution of the will, it was

altered, was it competent to show by Alexander that the identical paper offered for probate was read by him to Shorter, recognized by him as his will, referred to by his direction in the codicil and ratified and republished therein? And in the other view of it, the question is the same: Was it competent to show by Alexander that, notwithstanding the confusion in the numbers, the testator recognized this identical paper as the will which he had executed on the date and in presence of the witnesses named therein and referred to both as to date and witnesses in the codicil? And when the proof was admitted, is it sufficient, with the adminicular proofs, to set up the will under the law?

The cases cited from the English courts would set it up. How is it with the Georgia Code and decisions thereon? The Code, section 2457, *supra*, declares: " When called upon to construe a will, the court may hear parol evidence of the circumstances surrounding the testator at the time of its execution; so the court may hear parol evidence to explain all ambiguities, both latent and patent." The law is that on the issue of *devisavit vel non*, wider latitude is allowed in letting in parol testimony than in the construction of clauses of the will which convey items of property. So that if the surrounding circumstances be admitted to construe the terms of the will, *a fortiori* will they be admitted on the issue of the *factum* of the will. Indeed, they are always so admitted. What transpires between the scrivener and the testator is that circumstance surrounding the testator more important than all others. What transpired therefore between Alexander and Shorter touching the codicil must go in as specified in the statute and over and over decided by all the courts; for the effect of the language of Judge Lumpkin, *supra*, is that all admit that the statements made then and before that date are admissible on this issue of will or no will. But the codicil refers to, and is annexed to, the other paper, and republishes something, identifying this paper in many

references to its bequests as that something. Shall the witness be cut off from telling what the testator said to him about that annexed paper, on which the codicil was framed, and without which the codicil cannot be executed? It would be very strange if such were the law. It would be as unreasonable as singular, especially as that paper, as well as the codicil, was submitted to his care as the confidential lawyer to put his mind upon and act in reference to both, and make both legal. If Alexander had written that other paper, as he did write the codicil, could he not identify what he wrote himself? If so, why can he himself not identify this paper, though in the handwriting of the testator, if he read it in the presence of the testator, examined it closely to make a codicil to its provisions, and therefore of his own knowledge is sure that it is the veritable paper he fastened to the codicil, and sealed them up together, and directed them to the ordinary in the presence and by direction of the testator? and why need it be identified by the other witnesses to the codicil or the will further than by their signatures thereto?

But in order to make assurance doubly sure, our statute goes further and admits parol evidence to explain all ambiguities, latent or patent.

Is there no ambiguity on the face of the will itself as to the number of pages? Most clearly there is. On the top numbering it is ten; in the body of the last page it is said the will is from one to eleven inclusive. So that there is ambiguity there. And taking the two papers as one instrument, there is still ambiguity, for the codicil continues to number from eleven as the last page of the will. Bearing in mind the rule that there is more strictness in confining parol testimony in construction of wills than on their probate, cannot this ambiguity be explained, and the identity of this paper as the will of July, 1881, be shown by Alexander?

It seems quite clear to us, after a careful consideration of the whole case, that it can be done. The truth is, the

doors of justice open wider day by day to the admission of testimony, and this parol evidence to explain all ambiguities in instruments of all sorts is made legal by our statute law. Code, §2757. The testimony, by our own law, is therefore made admissible, and if admitted and believed, there is no room for doubt about the truth of the case. Ought it to be believed? His character is unimpeachable. He takes nothing under the will. He is wholly disinterested. He is corroborated by the reference made in the codicil unmistakably to items of the will; by the fact that the residuary clause numbered nine, with no alteration in that number, and in the handwriting of, and marginally signed by, the testator, is exactly where it ought to be, that is, immediately preceding the page which appoints the executors and attests the will; and thus the probability is very strong, almost conclusive, that there was no need of another page between nine and ten, and that, when the will was executed, no such page was there, though in the original draft there were probably eleven, but before executing the will the testator had reduced the number to ten; by the fact that there had been a former will, and loose sheets in the handwriting of testator were found, so that it is extremely probable that he used the pages whose numbers were altered from former drafts, and rewrote the residuary clause to Mrs. Hamilton, and put it, rewritten, exactly where it belonged, before the clause of attestation which was used by him as written and numbered before in the body of the page, but altered on top, as were other numbers on the top of other pages; by the fact that Mrs. Hamilton had been, to all intents and purposes, his adopted daughter, and nearer and dearer to him than any being his wife left behind her; by the fact that the college was also dear to him and was provided for by him next to her whom he had raised from infancy; by the fact that he had been thrown into close relationship with the kindred of his wife and dissociated from his own, so that naturally his heart-strings twined more closely around

them, and his affections for them from childhood were nurtured by their environment, and grew with their growth, and blossomed and ripened into this will and the large bequests it made to them; by the fact that this paper of ten pages is attached to the codicil, which itself, if other wills competing with this and completed were offered against it, would be conclusive, but as it stands is a powerful circumstance to show that the ten pages so fastened is the original will executed the 18th of July, 1881, just as it was then attested, and by the fact that the will in its essential features accords with the intentions of the testator in respect to the disposition he designed to make of his property as expressed to others than Mr. Alexander, and that each page of it is all his own handwriting and is signed by him on the margin of each, and thus is each separate page his will indubitably as to what is written thereon, and under the authorities cited, and our own adjudications could be set up, if part could not be. See *Morris and Wife vs. Stokes,* 21 *Ga.,* 552.

Against the testimony of this disinterested and perfectly credible witness, thus corroborated, what do the caveators urge? Nothing, except that the testator republishes, by the codicil, "the will made by myself on the 18th day of July, 1881, and attested by W. F. Ayer, J. C. McDonald and J. B. Hine; said will is now ratified, approved and declared to be my last will in all respects, except in so far as the same is changed by this codicil;" and in that will on the last and attestation page are these words: "I nominate and appoint David B. Hamilton, Judge George Hillyer and Eben Hillyer to be executors of this my will, to carry the same into effect according to law, and which will I have written on the above and foregoing pages numbered from 1 to 11 inclusive, and identified by my name on the margin, and hereunto subscribed my hand and affixed my seal for its due execution, this the 18th day of July, 1881," and they insist that the will "so ratified, approved and declared to be his (my) last will," is not the paper offered, because

the 10th page is missing, and the codicil uses the language that it is so ratified, approved and declared his will "in all respects, except in so far as the same is changed by this codicil." They insist that a particular will is referred to in the codicil, and not this one set up by the jury, because the codicil does not alter, but rather affirms it in respect to the numbering, by itself continuing to number 12, 13 and 14 on the top of its own pages, and that the law is, in such a case, that if that particular will be not produced, nothing is republished by the codicil, and that there is no legal proof that the missing page was out when the original will was executed. The point is not destitute of acumen, nor devoid of force ; but if well taken, what part of this will would it pierce to death ? What was on that missing page, if there when this will was executed ? No human being knows. Therefore, the principle that the parts of the will identified would not fail of probate on account of a missing part, whose contents were unknown, would save much, if not all, of this will. Every special legacy, and all are special but one, is identified by the handwriting of the testator by his signature on the margin, and by numbers, most of them, all except two, unaltered, and within the numbers one and eleven.

Will a court conjecture that this absent page affected them ? How could it ? The testator made a codicil conceded to be all right, and that did not affect or alter either specific legacy, except as named to add to the college endowment, and to change the legacy to Milton A. Cooley in consequence of his death. Will a court seeking truth presume that others were altered by a missing page on the original will ? We cannot think so for a moment. So that nothing is left for it to operate upon except the residuary clause and the legatee under it. Was there in it any provision that lessened that ? It is unreasonable to think so. That residuary clause is numbered 9. It precedes the last page—the attesting page, originally 11, now changed to 10, and there is no alteration of a figure

or letter on that residuary-legacy page, but the next page is altered from 11 to 10. To a fair mind it would seem infinitely more probable that there was no such missing page when the will was executed, but that testator used the attesting page of a former will, or draft of a will, which was originally numbered 11, and when he re-wrote the residuary clause on page 9, and put it in the will he intended to execute on the 18th of July, 1881, he altered 11 on the top of the old page to 10, and put that in after the clear page making his residuary bequest, and neglected at the same time to alter the summary from 1 to 11 in the body of this old page so used; it is much more reasonable, I repeat, so to conclude, than that he put in his will after the residuary clause or page, and between it and the attesting page, something which cut down the residuum.

It is more reasonable to think so, because the residuary legatee was the apple of his eye, the little one whom he had raised, the womanly and loving nurse, who let him down as gently as loving arms could into his grave.

But, if cut down, how much must it be topped? Nobody can answer. To whom must that which she loses be paid? Nobody can tell. She is certainly his residuary legatee, nobody can doubt that. The clause that makes her so is in his handwriting; his name is on its margin; he numbered it on top 9; that number is within 1 and 11, and there is no sort of suspicion about letter or figure on that page. If a court of justice should construe her to have nothing, it would be to dethrone itself, and seat injustice in its stead. If asked to take from it something and give it to somebody, surely the court may inquire how much, and to whom? The only answer echo makes is, "How much and to whom?"

But the codicil refers to the will, and identifies what it is otherwise than by the words "in all respects," etc. It makes allusion to sundry specific legacies in the will unmistakably, by implication strongly to a residuary legacy, and to a book in which certain accounts are kept.

So that the words "in all respects" become themselves ambiguous as to what they allude to. The language is "in all respects, except in so far as the same is changed by this codicil." The codicil changes it only as regards legacies, bequests, not as to figures. Figures, in all probability, were not in the mind of testator or scrivener. Were they or were they not, is ambiguous at least, and under the Georgia statute may be explained, whether latent or patent. And so may the figures, the paging, the position of the residuary clause, of the attesting clause, the alteration of some paging, none in others, the change of one page on top to 10 from 11, and 11 unaltered in the body of the same page, all make ambiguities patent on the face of the will, and in the references of the codicil thereto, and thus all are open to explanation by parol evidence, both of what the witness himself did and knows of his own knowledge, as of what the testator said to him at the very time he was instructing him what changes he wished made in the will which he wished him in the codicil to republish. And when that testimony is in, all doubts vanish, as with the aid of the face of the papers themselves, the improbability of tampering with a will and not altering the body paged figure 11 as well as the top paged figure 11 (fraud puts out its tracks better than that), the cancelled loose sheets, and others found, and the accordance of the will with the avowed purpose of the testator long entertained,— all the evidence shines upon the case, the clouds disappear and the light is let in, so that the truth beams clearly on the inquiring mind.

After a most careful study of the case and the law applicable thereto, my mind settles in the conviction that nothing outside of my personal knowledge, and dependent upon human testimony, is more morally certain to me, than that this codicil, with the ten pages of what purports to be a will attached to it, is the disposition, and the whole disposition, which Alfred Shorter desired to make, and according to aw did make of his property at his death.

See further, 21 *Ga.*, 552 ; 7 *Ib.*, 438 ; 28 *Ib.*, 382, 104–5–6 ; 32 *Ib.*, 325, 156 ; 14 *Ib.*, 596, 375–6 ; Williams on Ext'rs, bottom p. 353, *et seq.*

5. There was no error in striking the jury from the grand jury list. Acts of 1869, p. 141, Code, §§3925, 3926. The judge has the discretion to do so in trying issues in civil cases. This is an issue in a civil case. The fact is that, as by the constitution they are composed of the most intelligent men, the discretion is wisely exercised.

6. There was no error in the charge and refusals to charge on the subject of the will being unnatural. By the law of God, man and wife are one, and her kindred are his. The same rule is applied by human law in selecting jurors and in respect to the credibility of witnesses, to the wife's kindred equally with the husband's, where the issue is the husband's impartiality or credit. It was more natural, really, in the case at bar, that the testator should have given his property to his wife's kindred, who grew up around him, and associated with him, especially to those whom he raised from infancy, than to his own, whom he rarely saw and scarcely knew.

7. There is not enough evidence on the issue of undue influence to raise a question about its exercise by anybody over such a man as Shorter was, in the legal sense of undue influence, and therefore there was no error that hurt in the refusal to charge as requested thereon.

8, 9. In ruling and charging to the effect that parol evidence could not change, add to or contradict the writing, but where there were ambiguities they could be explained by it, whether latent or patent, and in refusing requests which militated against this view of the case, there was no error. In our judgment, there were ambiguities needing explanation, as heretofore considered, and therefore the court should not have charged on the theory that there were none.

So in respect to the admission and effect of parol evidence to identify the paper propounded as the will of the

decedent, under the views already submitted, there was no error; and in comparing the requests to charge refused, given or modified with the charge itself, we see no material error which, in view of all the facts before the jury, satisfies us that the ends of justice demand a new trial. On the contrary, the general tone of the charge is fair, the issues are fully and fairly submitted and commented upon with entire impartiality, and a different result could not have been reached, in view of all the facts and the law applicable thereto.

10. We hesitated much on the denial of the continuance, in view of the fact that some heirs at law had but recently been made parties, and one witness on the question of undue influence had not been examined by interrogatories and was under promise to be present, and her presence was very desirable, as stated by counsel. But in the light of the rule that motions to continue are much within the discretion of the presiding judge, and unless that discretion has been abused and the ends of justice demand it, the rule is inflexible that this court will not interfere, and having carefully examined the evidence which counsel hoped to procure, and failing to see a probability of a change of the verdict on undue influence, or that there ought to be a change of it on that evidence, we do not see how, without departing from a long current of authority from first Kelly down, we can control the discretion of the presiding judge. Nor do we see that the other point is stronger, to-wit, that certain clients had just been made parties. They lived in other states; they could not have been of much use on the issue of undue influence; most, if not all, were infants; the great issue in the case was upon legal questions on the admissibility of the testimony of Mr. Alexander, on the admissibility of testator's statements, on the words and figures of the will and codicil, whether plain or ambiguous, upon which questions it is quite difficult to see how strangers and infants could throw much light and contribute much strength to so able an array of coun-

cil as represented the caveators, especially as it is not hinted that either absent client was a lawyer.

Besides, we feel satisfied with the verdict. It is right on the law and facts. It is indeed a verdict. The truth is said by this jury; and no technical objection to rulings on evidence, or to charges not affecting the merits, or difference of opinion between members of this court and the presiding judge below on the point whether we, if on the *nisi prius* bench, would have exercised the discretion then lodged in us differently from his exercise of it, would, in such a case as the review of the law and facts of this make it, justify us in awarding a new trial over the head of the circuit judge.

Judgment affirmed.

HALL, Justice, concurred, but furnished no written opinion. He stated, on the subject of the continuance, in addition to what Chief Justice Jackson had said, that persons could not enter a litigation and be made parties for their own benefit, and then claim a delay merely because they had been so made.

BLANDFORD, Justice, dissented, but furnished no written opinion. He was of opinion that a continuance should have been granted.